931 P.2d 1067

**Krag KADERA and Erin Kadera, husband and wife, Petitioners,**

v.

**SUPERIOR COURT of the State of Arizona, IN AND FOR the COUNTY OF MARICOPA, The Honorable Mark Aceto, a judge thereof, Respondent Judge,**

**CONSOLIDATED COOPERATIVE OF SCOTTSDALE EAST, INC., Real Party in Interest.**

No. 1 CA–SA 95–0265.

Court of Appeals of Arizona, Division 1, Department E.

Feb. 29, 1996.

Reconsideration Denied Sept. 27, 1996.

Review Denied Feb. 26, 1997.*

* Feldman, J., of the Supreme Court, voted to grant the Petition for Review to hear oral argument.

Theodore C. Jarvi, Tempe, and Cromwell & U'Ren by Stephen A. U'Ren, Tempe, for Petitioner.

Ayers & Brown, P.C. by Joseph M. Hillegas, Jr., Phoenix, for Real Party in Interest.

## OPINION

GRANT, Judge.

Krag and Erin Kadera ("Petitioners") bring this special action asking this court to accept jurisdiction and determine whether a cooperative corporation may initiate summary proceedings against a cooperator-shareholder in an alleged breach of an occupancy agreement. For reasons that follow, we accept jurisdiction and grant relief.

## SUMMARY OF FACTS AND PROCEDURE

On January 22, 1993, Petitioners purchased one share of stock in Consolidated Cooperative of Scottsdale East, Inc. ("Respondent"/"Respondent Corporation") from a former shareholder. Respondent is a non-profit corporation organized under Arizona law. Petitioners paid $21,000 for their share in Respondent Corporation. Respondent, however, claims it does not know how much Petitioners paid for their interest. This purchase gave Petitioners the right to live in Unit D–14 ("the Unit"), a three-bedroom residence.

At the time of purchase, Petitioners were required to sign a Beneficiary Designation Form which created a joint tenancy with the right of survivorship in the property. Furthermore, to sell or transfer their interest, Petitioners had to agree to follow the method prescribed in Respondent Corporation's published Policy for Transfer of Membership.

Upon taking possession of the Unit, Petitioners were bound by an Occupancy Agreement. Under the terms of the agreement, Petitioners were obligated to pay Respondent a $200.00 "monthly carrying charge." This amount represents Petitioners' one-twelfth proportionate share of Respondent Corporation's annual expenses. Although Respondent does not allege Petitioners have defaulted on any of their financial obligations, under the terms of the Occupancy Agreement, had Petitioners defaulted, they would have had their right to own and hold a membership in Respondent Corporation revoked. Moreover, by signing the agreement, Petitioners agreed that, if they were ever dispossessed by a court-entered judgment or warrant, they would waive their right of redemption.[1]

On July 20, 1995, Respondent gave Petitioners a written, seven-day Notice of Default, Intention to Terminate Agreement, and Demand for Possession of Premises. The notice, however, contains the wrong unit number. Petitioners' Unit identification is D–14; the Unit to which the notice repeated-ly refers is B–15. The notice stated if after seven days the breach is not cured, Petitioners must immediately vacate the Unit or an eviction action would be brought against them.

On August 16, 1995, Respondent filed a forcible entry and detainer action in Superior Court under Arizona Revised Statutes Annotated ("A.R.S.") section 12–1171. In its complaint, Respondents allege Petitioners allowed a non-relative to reside in their unit and conducted a babysitting business from it. Both of these actions violated the non-financial terms of the Occupancy Agreement. Respondent does not claim Petitioners have ever failed to comply with their financial obligations to Respondent Corporation; nor does Respondent claim Petitioners have defaulted on their monthly carrying charges.

Petitioners filed a Motion to Dismiss the complaint arguing the trial court lacked subject matter jurisdiction to conduct a summary disposition proceeding against them pursuant to A.R.S. section 12–1171 et seq. On September 29, 1995, however, the trial court denied Petitioners' Motion to Dismiss, and entered an order scheduling a trial under the forcible entry and detainer statutes. On October 10, 1995, Petitioners filed this special action from that denial of dismissal. Petitioners and Respondent have stipulated to a stay of proceedings pending the outcome of this petition for special action.

## DISCUSSION

We have jurisdiction to hear this special action pursuant to A.R.S. section 12–120.21(A)(4). We accept jurisdiction and grant relief on the grounds that the trial court is threatening to proceed without subject matter jurisdiction in excess of its authority. Ariz.R.P. Special Actions, Rule 3(b). Furthermore, Petitioners have no adequate remedy by appeal. Ariz.R.P. Special Actions 1.

The substantive issues presented in this special action are:

---

1. It is for this reason that Petitioners note in their brief that a summary disposition by this court of their Petition for Special Action could cost them the $21,000.00 purchase price, among other expenses.

1. Does the National Housing Act preempt the application of Arizona law where there is a breach by a cooperator-shareholder in a cooperative corporation?

2. Are summary dispossession proceedings appropriate in the residential housing cooperative context?

3. Does a cooperator-shareholder own a real property interest?

4. What are the remedies available to the cooperative corporation for breach?

## I. FEDERAL PREEMPTION

Respondent cites *Martin v. Villa Roma Inc.*, 131 Cal.App.3d 632, 182 Cal.Rptr. 382 (1982), arguing since Respondent Corporation is "subject to the terms of both a regulatory agreement with [Housing and Urban Development ("HUD")] [2] and the regulations and statutes enforced by that [agency]," we are bound by HUD's characterization of the relationship between Respondent Corporation and Petitioners as landlord and tenant.[3] *See* 12 U.S.C.A. § 170 et seq. We disagree. HUD characterizes this relationship for the narrow purpose of administering a national federal mortgage insurance program. This characterization does not prevent us from arriving at our own characterization. Because we find preemption inapplicable in this context, we are free to decide this issue independent of the National Housing Act and HUD.

■ Federal preemption of state law may be explicit or implicit. *Arizona Farmworkers Union v. Phoenix Vegetable Distrib-*

*utors*, 155 Ariz. 413, 416, 747 P.2d 574, 577 (App.1986). Preemption is mandated if Congress expressly reserves to itself the exclusive power to regulate a given area of law. *Id.* Preemption is also mandated if, in the absence of an express statutory provision, the structure and purpose of a federal statute impliedly preempts state law. *Id.* Congress' intention to preempt state law may be inferred from a statute in which "the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress" meant to occupy the regulatory field. *California Federal Savings and Loan Association v. Guerra*, 479 U.S. 272, 280–81, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987). The mere fact that Congress enacted a detailed regulatory scheme, however, does not by itself imply preemption of state remedies. *English v. General Electric Co.*, 496 U.S. 72, 87, 110 S.Ct. 2270, 2279, 110 L.Ed.2d 65 (1990).

■ At issue here is section 1701j–3 of the National Housing Act which contains a clause expressly preempting due-on-sale prohibitions.[4] In the Act, Congress retains the exclusive power to preempt state laws prohibiting a lender from declaring secured sums due and payable if the interest securing the real property loan is sold or transferred without the lender's consent. Congress' retained ability to preempt state law in this area is therefore extremely limited. Thus, the Act's express preemption clause is not relevant to the issue now before us.

2. Respondent Corporation's "Introduction to Living at Consolidated Cooperative of Scottsdale East, Inc." states in part:

The property mortgage is insured under Section 213 of the National Housing Act. In connection with this insurance, Consolidated Co-Ops has entered into a "Regulatory Agreement" with HUD which, [sic] very briefly states that we will "pay our mortgage payments on time, set aside specific amounts of money for reserves, and that units will be owner occupied." The Regulatory Agreement is of course quite lengthy, however the above indicates the major provisions.

3. Article XII of the Occupancy Agreement provides:

The member [expressly] agrees that there exists under this Occupancy Agreement a land-

lord-tenant relationship and that in the event of a breach or threatened breach by the Member of any covenant or provision of this Agreement, there shall be available to the Corporation such legal remedy [or] remedies as are available to a landlord for the breach or threatened breach under the law by a tenant of any provision of a lease or general agreement.

4. Section 1701j–3(b)(1) states:

Notwithstanding any provision of the constitution or laws (including the judicial decisions) of any State to the contrary, a lender may ... enter into or enforce a contract containing a due-on-sale clause with respect to a real property loan [A real property loan includes "the stock allocated to a dwelling unit in a cooperative housing corporation."]

No implied preemption prevents us from defining and regulating the relationship between a cooperator and cooperative corporation. The National Housing Act was passed with a specific goal in mind: to promote home ownership by providing assistance to borrowers in the form of federal mortgage insurance. Congress intended to create a statutory financing mechanism and thereby occupy and regulate the field of federal mortgage insurance. The National Housing Act, then, is limited to this narrow function and purpose. State law must necessarily fill in the regulatory gaps created by the Act. Furthermore, as established above, the mere fact that the National Housing Act is an extremely detailed regulatory scheme does not *per se* imply preemption.

The question of Congressional intent is central to any analysis of preemption. *Guerra,* 479 U.S. at 280, 107 S.Ct. at 689. The analysis must begin "with the assumption that Congress did not intend to displace state law." *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981). Moreover, there is a presumption "against finding preemption of state law in areas traditionally regulated by the States." *California v. ARC America Corp.,* 490 U.S. 93, 101, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989). Furthermore, the "narrowness and precision" with which Congress does preempt state law "cuts against an inference of a Congressional intention to preempt laws with a broad brush, and without express reference." *Keams v. Tempe Technical Inst., Inc.,* 39 F.3d 222, 226 (9th Cir.1994). Thus, as the Supreme Court stated:

"[w]hen Congress has considered the issue of preemption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with respect to state authority, there is no need to infer congressional intent to preempt state laws from the substantive provisions of the legislation."

*Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 517, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992) (internal citations and quotation marks omitted).

Congress' intention in promulgating the National Housing Act was to further the goal expressed in Title 42 U.S.C. section 1441a(a): to realize "as soon as feasible ... the goal of a decent home and a suitable living environment for every American family." Congress only preempted state law with respect to due-on-sale clauses, therefore we assume Congress never intended that state law would be otherwise displaced. Furthermore, the areas of law implicated here, including real property, landlord-tenant, and corporations, are all areas traditionally regulated by the states, rendering federal preemption even more unlikely.

Where Congress has not occupied the regulatory field, however, federal law may still preempt state law if the laws *actually conflict* with one another. *Guerra,* 479 U.S. at 280–81, 107 S.Ct. at 689. In other words, preemption is implied where "compliance with both state and federal law [would be] impossible." *Keams,* 39 F.3d at 225 (quoting *ARC America Corp.,* 490 U.S. at 100, 109 S.Ct. at 1665). In addition, if the interests involved are uniquely federal, *Boyle v. United Technologies Corp.,* 487 U.S. 500, 504, 108 S.Ct. 2510, 2514, 101 L.Ed.2d 442 (1988), the dominant federal interest "will be assumed to preclude enforcement of state laws on the same subject...." *Arizona Farmworkers,* 155 Ariz. at 416, 747 P.2d at 577.

An actual conflict exists when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Fidelity Federal Sav. and Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). A court must "consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written." *Jones v. Rath Packing Co.,* 430 U.S. 519, 526, 97 S.Ct. 1305, 1310, 51 L.Ed.2d 604 (1977). The Arizona Supreme Court acknowledged that "where state laws would obviously frustrate congressional purpose," federal law will control. *El Paso Natural Gas Co. v. Mohave County,* 133 Ariz. 59, 63, 649 P.2d 262, 266 (1982) (citing *Maryland,* 451 U.S. at 747, 101 S.Ct. at 2129; *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218,

230–31, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)).

Here, no actual conflict exists between Arizona and federal law. As we have already indicated, the fact that HUD requires Respondent to characterize the relationship in question as landlord-tenant for limited federal purposes has no effect on our characterization for the purpose of applying Arizona law. In addition, compliance with both state and federal law is not impossible. To the contrary, given that the language required by HUD is a formality necessary to administer a national housing scheme, the language amounts to little more than a procedural convenience designed to ensure the uniform application of a federal statute. Finally, it cannot be said that the substantive determination of real property interests is a federal interest so unique that it precludes the enforcement of Arizona laws governing these interests. Arizona law, therefore, presents no obstacle to the accomplishment and execution of the full purposes of the National Housing Act.

While it is true that "[s]tate law procedures governing property relationships do not apply to federally created property rights when the state procedures do not adequately protect federal interests," *United States v. Dos Cabezas Corp.,* 995 F.2d 1486, 1493 (9th Cir.1993), such an argument cannot be made here. By holding that the relationship between cooperator and cooperative corporation is outside the scope of landlord-tenant law, we further the goals of the National Housing Act. Our holding that the cooperator owns a real property interest increases the methods by which Arizona residents can obtain home ownership. In this way, we promote rather than limit the national goal of home ownership for American families, and go well beyond the protections contained in the National Housing Act. We now move to a consideration of Arizona law.

## II. THE INAPPLICABILITY OF ARLTA AND SUMMARY PROCEEDINGS

■ The legislative purpose behind the Arizona Residential Landlord and Tenant Act ("ARLTA") is expressed in section 33–1302: ARLTA was passed both to "simplify, clarify, modernize and revise the law governing the rental of dwelling units and the rights and obligations of landlord and tenant," and to "encourage landlord and tenant to maintain and improve the quality of housing."

ARLTA undisputedly is inapplicable to the facts of this case. The legislature unequivocally excluded from the reach of ARLTA a residential occupant who is also an "owner of a proprietary lease in a cooperative." ARLTA § 33–1308. Thus, ARLTA section 33–1377, which allows a landlord to institute a special detainer action against a tenant for breach, is unavailable to Respondent in the instant case.

Respondent Corporation does not argue it is entitled to exercise the ARLTA provisions; rather, it argues it is entitled to bring an action for forcible entry and detainer against Petitioners under A.R.S. section 12–1171 et seq.[5] The forcible entry and detainer proceeding contained in this statute applies to a "holdover by a person to whom lands, tenements, or real property were let." Respondent Corporation cites *Andreola v. Arizona Bank,* 26 Ariz.App. 556, 550 P.2d 110 (1976), in support of its argument that a forcible entry and detainer action is appropriate here because such actions are not limited to the formal lessor-lessee relationship. Nevertheless, *State v. Carrillo,* 26 Ariz.App. 113, 546 P.2d 838 (1976), holds that section 12–1171 et seq. applies only to landlord-tenant relationships. Because neither a landlord-tenant nor lessor-lessee relationship exists between these parties, *Andreola* is inapplicable. Furthermore, although the parties "agreed" to the landlord-tenant characterization, this agreement is not binding. Arizona law has established that parties may not confer subject matter jurisdiction on a court that it does not otherwise have. *See Lamb v. Supe-*

---

**5.** Article XII of the Occupancy Agreement gives Respondent a right of re-entry to remove persons and personal property from a Unit by either summary dispossession proceedings or other action applicable to the eviction of tenants upon breach of the agreement. In addition, Respondent has "the right of injunction and the right to invoke any remedy allowed at law or in equity, as if reentry, summary proceedings, and other remedies were not herein provided for."

*rior Court,* 127 Ariz. 400, 621 P.2d 906 (1980); *Kelly v. Kelly,* 24 Ariz.App. 582, 540 P.2d 201 (1975).

While the legislature authorized the use of summary proceedings in the residential landlord-tenant context, it excluded a holder of a proprietary lease in a cooperative from the reach of these proceedings. Statutes must be interpreted according to the fair meaning of their provisions, and any interpretation must take into account and further the policies underlying them. *State v. Lammie,* 164 Ariz. 377, 793 P.2d 134 (App.1990). Under ARLTA, the cooperator is not a "tenant," nor is the cooperative corporation a "landlord" as these terms are defined by the statute. Moreover, the cooperator and cooperative corporation are not in a lessor-lessee relationship.

Unless it is clear from the language of the statute that another meaning was intended, the words in the statute are to be accorded their usual and commonly understood meaning. *Prescott Newspapers, Inc. v. Yavapai Community Hosp. Ass'n,* 163 Ariz. 33, 785 P.2d 1221 (App.1989). In general, we consider the meaning naturally attaching to statutory language; the meaning we adopt is the one that best harmonizes with the overall context of the statute. *Maricopa County v. Arizona Tax Court,* 162 Ariz. 64, 781 P.2d 41 (App.1989).

The legislature recognized that although the cooperative is a hybrid property arrangement wherein the line between ownership and leasehold blurs, the cooperator has a real property ownership interest. The term "proprietary lease," used frequently to identify the relationship between the cooperator and cooperative corporation, is oxymoronic. The cooperative corporation may indeed hold title to the real property, nevertheless, the cooperator also owns a real property interest. Precisely because the legislature recognized that hybrid property arrangements carry with them ownership interests, section 33–1308(6) of ARLTA excludes from its reach not only cooperatives, but also condominiums.

Petitioners argue since ARLTA's special detainer action, which incorporates section 12–1177, excludes cooperatives neither proceeding is appropriate. We agree. To hold otherwise would give cooperators far fewer protections than tenants are guaranteed under ARLTA. Surely the legislature did not intend this result. While an ordinary tenant may forfeit a deposit upon breach, the cooperator has considerably more at stake because the total investment is so much greater.[6] Thus, we find ARLTA and summary proceedings inappropriate in the context of residential cooperative housing.

### III. THE NATURE OF PETITIONERS' PROPERTY INTEREST

Respondent Corporation argues that since it has title to the real property, Petitioners cannot own a real property interest. We disagree. Respondent Corporation was established for the sole purpose of selling real property interests on a non-profit basis in the cooperative housing complex it owns, and Petitioners purchased such an interest. It was not necessary that title pass in order for Petitioners to have a real property interest. Moreover, the fact that this interest in land was not conveyed by a real estate sales contract is not fatal to the sale. A.R.S. section 32–2101 defines a real estate sales contract as:

> ... an agreement in which one party agrees to convey *title* to real estate to another party upon the satisfaction of specified conditions set forth in the contract.

(Emphasis added).

Indeed, the very nature of this transaction would prevent the use of such an instrument since neither of the parties intended that title to the real property would be transferred.

Our supreme court has held in previous decisions that, in general, "[p]roperty does not necessarily refer to a physical object itself but to certain rights over the physical object"; that ownership may be defined as "the right to [possess], use, and [dispose] of the thing in such a manner as is not inconsistent with law." *In re Forsstrom,* 44 Ariz.

---

6. Petitioners invested $21,000 up front, in addition to the monthly carrying charges.

472, 480, 38 P.2d 878, 882 (1934). In addition, "[t]he word 'ownership' covers different estates in real property and ... has no technical meaning." Finally, in Arizona statutes, we must interpret the word "ownership" to have "the widest variety of construction, usually guarded in some measure by the object sought to be accomplished." *Pinkerton v. Pritchard,* 71 Ariz. 117, 123, 223 P.2d 933, 937 (1950).

This court has clearly stated that with respect to real estate sales, we will not exalt form over substance. *E–Z Livin' Mobile Sales, Inc. v. Van Zanen,* 26 Ariz.App. 363, 548 P.2d 1175 (1976). In *E–Z Livin',* we adopted the following reasoning:

> The answer is not to be found in the name which the parties gave to the instruments, and not alone in any particular provision they contain, disconnected from all others; but in the ruling intention of the parties gathered from the language they used and the circumstances surrounding its use. *We must look to the purpose of the instruments, their substance and not their form. Merely giving to them a particular name or form did not take away the nature and effect of the transaction.*

*E–Z Livin',* 26 Ariz.App. at 364, 548 P.2d at 1176. (Citations Omitted and Emphasis added).

*E–Z Livin'* involved the sale of a house trailer and lot. When the Van Zanens were unable to secure financing, they entered into an agreement, characterized as a lease, with the seller. We held based on the facts of the case and notwithstanding the "lease option" characterization, that the agreement was a contract for the sale of real estate. Furthermore, we found the "lease" was "a clear attempt to subvert the public policy of the state against forfeitures," and that the relationship at issue was not one of landlord and tenant, but vendor and vendee. We therefore held that forcible entry and detainer proceedings were inappropriate under those circumstances.

As in *E–Z Livin',* Respondent claims that Petitioners are tenants by virtue of a "lease" agreement. Nevertheless, the landlord-tenant language appears only in Article XIII, the default section of the Occupancy Agreement. Outside of this Article, and in other documents, Petitioners are consistently referred to as "members." Thus, Article XII can certainly be said to be a "particular provision ... disconnected from all others." Furthermore, upon examining the language and circumstances surrounding this transaction, it becomes clear that the parties intended that Petitioners assume responsibilities far beyond those usually attributed to tenants. Moreover, the amount of money Petitioners invested in their membership indicates their intention that a real estate interest would be conveyed. Because we will not exalt form over substance in real property transactions, we reject Respondent's claim, and hold that Petitioners own a real property interest in the housing cooperative, notwithstanding the existence of an "authentic instrument" vesting title and deed in Respondent Corporation.

With the exception of a title transfer, there are all of the indications of a residential real estate transaction here. Petitioners chose the location and neighborhood in which they wanted to live. No doubt their decision was partially based on Respondent Corporation's description of the benefits of cooperative ownership over renting in its "Introduction to Living at Consolidated Cooperative of Scottsdale East, Inc.":

> Membership in Consolidated Co–Ops provides the member with many *advantages of home ownership but without the mortgage liability and accompanying responsibilities.* The most often cited advantage of Co-op living is economic. Co-ops are founded on the premise that cooperation leads to better services at lower cost and *Co-op charges are usually lower than those for similar rental units. Cooperators pay actual housing costs, not a landlord's profit. Pride of ownership and sense of community also contribute to reduced housing costs.*
>
> *Co–Op [sic] housing offers its members the opportunity to help determine the kind of community they will live in, the quaity of services it will provide and the way it will develop. Many members see this degree of control over their housing circumstances as an even greater advantage* than the

continuing financial bargain in housing that Co-ops offer.

(Emphasis added).

Once Petitioners decided to purchase an interest in Respondent Corporation they made a sizeable, initial investment. As a consequence of their investment, Petitioners own the exclusive right to occupy a particular unit in the cooperative housing complex. Upon taking possession, Petitioners began to pay their share of the monthly carrying charges necessary to sustain the cooperative corporation in which they owned stock. Petitioners' ownership interest is devisable and assignable; Article XXII of Respondent's Occupancy Agreement states: "This Agreement shall be binding on the personal representatives and successors in interest of each of the parties . . . ." In addition, as shareholders in the corporation, Petitioners gained the power to vote to amend the corporate bylaws.

As members of the cooperative, Petitioners form a part of the self-governing corporation. The Board of Directors is comprised of members from each of Respondent's seven housing complexes. The Board administers the affairs of the corporation, including: accepting or rejecting applications; employing managers to oversee the seven complexes; promulgating rules and regulations regarding the use and occupancy of the premises; and enforcing the by-laws, rules, and regulations. In addition, the Board calculates the monthly carrying charges on an annual basis, dividing the charges by the number of months in the fiscal year. The Board also authorizes any refunds or credits to Members at the end of each fiscal year if the year's carrying charges are greater than the corporation's actual expenses.

All of these factors indicate both Petitioners' intention to purchase a real property interest as well as Respondent's intention to sell them a membership in the corporation.

## IV. THE NATURE OF THE RELATIONSHIP

■ Respondent may not simultaneously claim to be in a landlord-tenant and corporation-shareholder relationship with Petitioners, while denying that Petitioners have any substantive rights or protections under either

theory. A typical corporation and stockholder relationship does not exist here. Indeed, Article VII of Respondent's Articles of Incorporation states: "Unless otherwise required by law, no dividend shall be paid at any time upon any membership in this corporation."

Although Petitioners own stock in Respondent Corporation, it is not the stock they enjoy but the right to exclusively and permanently occupy a specific unit in the cooperative. Shareholders do not purchase the stock prior to selecting the specific unit in which they will reside. Even Respondent Corporation's "Shareholder Guidebook for Cooperative Living" states that a buyer does not initially decide whether he or she wants to purchase a share of stock, but "[t]he buyer decides *which unit s/he wishes to purchase.*" (Emphasis added). Moreover, the buyer, not the corporation, selects the unit based on subjective criteria.

Respondent argues that because Petitioners are its shareholders, they have no right, title, or interest in corporate property, and therefore they may not interfere with Respondent Corporation's possessory interest in its assets. Respondent cites the case of *Riffle v. Robert L. Parker Co.*, 19 Ariz.App. 100, 505 P.2d 268 (1973), in support of this theory. *Riffle* involved the merger of a partnership and corporation. An ex-partner, fired after the merger, was given stock in the corporation. The ex-partner trespassed onto the corporation's premises and damaged machinery. The court held that, as a stockholder, he had no right entitling him to enter, not even to remove his personal property. The situation here, however, is quite different. Petitioners are "stockholders" in name only, and inherent in the value of the "stock" is the right to occupy a particular unit in a housing complex owned by a cooperative corporation. Thus, on this basis, we distinguish *Riffle.*

Although the relationship between a cooperative corporation and a cooperator/shareholder is unique, the relationship at issue here is akin to that found in a deed of trust arrangement. A.R.S. section 33–801(5) states that a trust deed "convey[s] trust property to a trustee or trustees . . . to secure the performance of a contract or con-

tracts . . . ." Qualifying trust property includes "any legal, equitable, leasehold or other interest in real property which is capable of being transferred, whether or not it is subject to any prior mortgages, trust deeds, contracts for conveyance of real property or other liens or encumbrances." A.R.S. § 33–801(6). Furthermore, a trustee can be "an individual, association or corporation." Finally, the legislature defined a "stock cooperative" as a "corporation formed or used to *hold title* to improved real property in fee simple or for a term of years." A.R.S. § 32–2101 (Emphasis added).

Here, Respondent Corporation obtained a mortgage, and then secured mortgage insurance under HUD pursuant to the National Housing Act. The corporation holds the title to the property "in trust" to secure the mortgage. Petitioners pay monthly their proportionate share of Respondent Corporation's annual "operating expenses." These expenses include, among other things:

(a) The cost of all operating expenses of the project and services furnished.

(b) The cost of necessary management and administration.

(c) The amount of *all taxes and assessments levied against the project* of the Corporation of which it is required to pay, and ground rent, if any.

(d) *The cost of fire and extended coverage insurance on the project and such other insurance* as the Corporation may effect or as may be required by any mortgage on the project.

\* \* \* \* \* \*

(h) *The amount of principal, interest, mortgage insurance premiums and other required payments on the hereinafter mentioned insurance mortgage.*

(i) Any other expenses of the Corporation approved by the Board of Directors, including operating deficiencies, if any, for prior periods.

(Emphasis added).

Given that Petitioners paid a large initial down payment and entered into a contract which requires that they pay on a monthly basis the principal and interest on the mortgage, as well as other operating costs, their real property interest is clearly in the nature of an ownership or fee interest.

## V. REMEDIES

■ Respondent Corporation lays out the remedies available to it in Article XI of the Occupancy Agreement. In particular, Respondent Corporation states that Petitioners waive their right of redemption in the following circumstances:

The Member hereby expressly waives any and all right of redemption in case s/he shall be dispossessed by judgment or warrant of any Court or judge; the words "enter," "reenter," and "reentry," as used in this Agreement are not restricted to their technical meaning, and in the event of a breach or threatened breach by the Member of any of the covenants or provisions hereof, the Corporation shall have the right of injunction and the right to invoke any remedy allowed at law or in equity, as if reentry, summary proceedings, and other remedies were not herein provided for."

This term of the Occupancy Agreement is void because it forces Petitioners to waive their right of redemption, a result that conflicts with our holding.

■ Respondent Corporation is barred from initiating any summary proceedings against Petitioners. Since Petitioners' interest is in the nature of real property, Arizona real estate law is controlling and supersedes any conflicting provisions contained in the Occupancy Agreement. Respondent Corporation has available to it all applicable statutory remedies relating to real property; Respondent must comply with the requirements of Arizona real property law in dealing with Petitioners' breach.

Our holding reflects our concern that this matter has broad significance even though at this time there are relatively few cooperatives in Arizona. The ever-increasing influx of new residents to our state, combined with the National Housing Act's policy of encouraging the formation of non-profit, cooperative corporations, may lead to an increase in the number of these alternative property holding arrangements. By deciding that residential housing cooperatives are governed by Arizona real estate law, we define and protect

both the rights of cooperators and cooperative corporations. Any resultant civil litigation will ensure that a body of law relating to residential cooperatives can be developed to further this goal.

## VI.  ATTORNEY'S FEES

Petitioners have requested attorney's fees. Pursuant to A.R.S. section 12–341.01(A), we award petitioners their attorneys' fees based on the fact that this matter arises out of contract. The amount of the award shall be determined upon Petitioners' compliance with Rule 21(c) Arizona Rules of Civil Appellate Procedure.

### CONCLUSION

When the legislature held that cooperatives are to be excluded from ARLTA, it excluded cooperatives from all summary proceedings, including those brought for forcible entry and detainer under A.R.S. section 12–1177 et seq.

Thus, we hold that a cooperative corporation's remedy for breach by a cooperator/shareholder lies in Arizona's real estate law. This matter is remanded to the trial court with directions to dismiss Respondent's complaint for Forcible Entry and Detainer.

WEISBERG and PATTERSON, JJ., concur.