Electronically Filed
Intermediate Court of Appeals
29546
28-APR-2011
08:28 AM

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---


HAWAIIAN PROPERTIES, LTD., Managing Agent,
Plaintiff-Appellee, v. REGINA P.D. TAUALA, Defendant-Appellant


NO. 29546


APPEAL FROM THE DISTRICT COURT OF THE FIRST CIRCUIT
EWA DIVISION
(CIVIL NO. 1RC07-1-6664)


APRIL 28, 2011


NAKAMURA, C.J., FOLEY and LEONARD, JJ.


OPINION OF THE COURT BY LEONARD, J.


Defendant-Appellant Regina Tauala (**Tauala**) appeals *pro se* from the Judgment for Possession (**Judgment**) and Writ of Possession (**Writ**), both filed on November 17, 2008 in the District Court of the First Circuit, Honolulu Division (**District Court**).[1] The District Court ordered that Plaintiff-Appellee Hawaiian Properties, Ltd. (**HPL**) was entitled to possession of the

---

[1] The Honorable Judge Gerald H. Kibe presided.

premises occupied by Tauala and issued a writ of possession against Tauala.

The threshold issue in this appeal is whether, as Tauala contends, the District Court erred in denying her Motion to Dismiss (**Motion to Dismiss**) for lack of jurisdiction. Based on the statutory limits of the civil jurisdiction of the district courts, as previously construed by the Hawai'i Supreme Court, we conclude that, as cooperative member, Tauala had more than a mere possessory interest in the subject premises and her right to occupy her cooperative unit cannot be cancelled or terminated in a district court summary possession action. Accordingly, we vacate and remand.

I.    BACKGROUND

    A.    The Parties' History

For many years, Tauala has lived in unit # 16C of Makalapa Manor Apartments, a Hawaii Cooperative Corporation (**Makalapa Manor** or the **Cooperative**), which is located at 99-128 Kohomua St., Aiea, Hawai'i. HPL is the managing agent for the Cooperative. It appears that the Cooperative was developed in the early 1970's, pursuant to financing insured by the federal Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner (**HUD**), and Tauala's parents bought into the Cooperative in 1971. A HUD-approved document entitled "Makalapa Manor Apartments Information Bulletin (**Information Bulletin**),"[2] which is cited by both parties in conjunction with the Motion to Dismiss, provides considerable insight into the nature of the Cooperative, including the following (emphasis added):

> A subscription for membership in a housing cooperative is more than an application for a place to live. It lends to **your participation in the cooperative ownership** and

---

[2]    Although undated, the Information Bulletin appears to have been provided to prospective members of the Cooperative prior to the financing and construction of the project.

operation of a housing project. . . . The cooperative approach to housing **instills a pride of ownership** resulting in a deeper interest in maintaining the property and participating in civic affairs. A cooperative is operated on a democratic basis. It gives the residents a greater insight and appreciation of the democratic process in general. **Cooperative residents normally occupy the premises for longer terms than renters**. . . .

      Cooperative housing offers the following financial benefits:

(1)    The absence from the monthly housing cost of the owner's profit inherent in most rental projects.

(2)    Tax benefits as described later in this Bulletin.

(3)    Rental schedules usually include an allocation for vacancy loss. In a cooperative, the monthly charges usually include only such income losses, if any, as have actually been incurred.

(4)    Maintenance costs in a well-operated cooperative are minimized since experience has shown that **owners take better care** of their property. Cooperative members frequently handle the redecoration of their units on a "do-it-yourself" basis, thus eliminating this as a project expense.

(5)    A cooperative is operated on a nonprofit basis. Thus, increases in the monthly housing cost are limited to actual increases in operating costs.

(6)    If a cooperative is successfully operated, a **modest equity accrued upon resale may result**, subject to limitations set forth in the By-Laws.

Your cooperative is receiving the benefit of special financing which Congress provided in Section 236 of the National Housing Act to assist families of lower income and displaced families in meeting their housing needs. . . .

. . . .

      The cooperative has been incorporated as a nonprofit cooperative housing corporation for the purpose of acquiring, owning, and operating a housing project consisting of town houses the permanent occupancy of which will be restricted to members in the cooperative. If your subscription is accepted by the cooperative and approved by FHA, you will become a member of the cooperative. The cooperative will deliver to you **the membership certificate representing your interest in the cooperative** not later than the time of initial mortgage closing, provided **your cash equity investment** has been paid in full in accordance with the terms of the Subscription Agreement. . . .

. . . .

      The funds provided by **your subscription and the subscription of other members will constitute the equity investment** and are intended to furnish the cost of acquiring the project over and above the mortgage proceeds and to provide working capital funds . . .

      **The cooperative's members are in effect their own landlord**. They pay monthly carrying charges to their cooperative in accordance with the Occupancy Agreement. The cooperative corporation holds title to the property and executes a blanket mortgage. The individual member signs no note or mortgage and has no personal obligation thereunder.

. . . .
[]   INCOME TAX ADVANTAGES.
      (a)   In computing his over-all housing cost, the
member may wish to consider the benefit of the federal
income tax deductions allowed to tenant-stockholders of
cooperative housing corporations under the provisions of
Section 216 of the Internal Revenue Code.  Under this
provision, provided 80 percent of the income of the
cooperative consists of carrying charges received from its
members, the **members are entitled to deduct** from their gross
income their proportionate share of **real estate taxes and
mortgage interest** paid by the cooperative. . . .
      (b)   A member of a cooperative has available to him
the **same basic federal income tax advantages available to a
home owner who sells his home and purchases a new one**.
Residence has been defined by the Internal Revenue Service
to include a cooperative apartment.  If a person sells or
exchanges his principal residence at a gain, the gain is
taxable.  However, if within the year before or the year
after the sale, the seller buys and occupies another
residence, the gain is not taxed at the time of the sale if
the cost of the new residence equals or exceeds the adjusted
sales price of the old residence. . . .
. . . .
      If after taking occupancy you wish to move from the
project, **you may sell your interest**, giving the cooperative
the first option to purchase your stock in accordance with
the terms of the By-Laws.  If the cooperative fails to
exercise its option, **you may sell your stock and right of
occupancy** to a purchaser approved by the cooperative.

In addition, the Information Bulletin provides, based

on full occupancy and subject to change, a schedule of "down

payments" and monthly carrying charges for each type of dwelling

units.  For example, for a 4-bedroom unit such as Tauala's unit,

the "Value Allocated to Unit by Sponsorship" is estimated (at the

time) at $31,977.00, with a "Proportionate Factor of Unit

Valuation to Total Valuation" of .010 (*i.e.*, 1%), a required cash

down payment of $319.77, and "Estimated Initial Monthly Charge to

be Paid to Cooperative" not less than $157.00 and not more than

$323.69.

In sum, although clearly not describing membership in

the Cooperative as fee simple ownership in real property, the

Information Bulletin describes membership as a federally-assisted

opportunity for low income and displaced families to:   (1)

participate in a form of housing ownership; (2) experience the

pride of ownership; (3) invest in their housing in a way that

4

will accrue equity, albeit in a modest amount; (4) benefit from the same federal income tax advantages as other homeowners; and (5) sell their interest and right of occupancy. In addition, the Information Bulletin distinguishes Cooperative residents from renters, describes Cooperative members as being in effect their own landlord, describes monthly charges as carrying charges that may be adjusted for actual income losses and operating expenses rather than rent, and explains that initial members pay a down payment and acquire an interest in the Cooperative corporation that is subject to valuation.

The By-Laws of Makalapa Manor Apartments (**By-Laws**), also cited by both parties in conjunction with the Motion to Dismiss, establish 122 "memberships" in the Cooperative and, *inter alia*: grant the Cooperative lien rights on Cooperative memberships to secure payment on any sums due under any occupancy agreements; allow a member to transfer membership by will or intestate distribution upon death; establish valuation terms and procedures for the Cooperative to "purchase" a membership and/or for a member to sell his or her interest to a third party, and provide for the Cooperative's purchase or sale of a membership to a third party upon termination of a membership for cause.

A Model Form of Occupancy Agreement between the Cooperative, Mary M. Dias,[3] and Tauala, dated September 30, 1996 (**Occupany Agreement**), was also before the District Court on the Motion to Dismiss. Like the By-Laws, the main body of the Occupancy Agreement refers to the payment of monthly carrying charges, equal to one-twelfth of the member's proportionate share of the sum required by the Cooperative to meet its annual

---

[3] The record is unclear as to the role of Mary M. Dias and her relationship to the Cooperative and Tauala. The first paragraph of the Occupancy Agreement states that the agreement is between the Cooperative and "Mary M. Dias and Regina P. Tauala (hereinafter referred to as Member)", but the signature block suggests, albeit inartfully, that Mary M. Dias executed the agreement as the President of the Cooperative.

expense, rather than rent. The Occupancy Agreement states a three-year term, but provides for "automatic renewal" at the member's option. A default provision in the Occupancy Agreement, however, states that upon any default by the member, the Corporation may give notice that the Occupancy Agreement will "expire" at a date not less than ten (10) days thereafter. The default provision also provides:

> If the Corporation so proceeds all of the Member's rights under this agreement will expire on the date so fixed in such notice, unless in the meantime the default has been cured in a manner deemed satisfactory by the Corporation, it being the intention of the parties hereto to create hereby conditional limitations, and it shall thereupon be lawful for the Corporation to re-enter the dwelling unit and to remove all persons and personal property therefrom, either by summary dispossess proceedings or by suitable action or proceeding, at law or in equity or by any other proceedings which may apply to the eviction of tenants or by force or otherwise, and to repossess the dwelling unit in its former state as if this agreement had not been made[.]

In addition, the default provision of the Occupancy Agreement states (emphasis added):

> The Member expressly agrees that **there exists under this Occupancy Agreement a landlord-tenant relationship** and that in the event of a breach or threatened breach by the Member of any covenant or provision of this Agreement, there shall be available to the Corporation such legal remedy or remedies as are available to a landlord for the breach or threatened breach under the law by a tenant of any provision of a lease or rental agreement.

A standardized addendum attached to the Occupancy Agreement (**Addendum**) includes provisions referring to "the Landlord" and "the Tenant." Although undefined, in context, it is clear that these terms refer to the Cooperative as the Landlord and the shareholder/member as the Tenant.

B.    The Alleged Payment Default

The Occupancy Agreement, as executed in September of 1996, provides that the monthly carrying charge for Tauala's dwelling unit is $624.00, along with reference to a Rent Supplement Contract with the HUD Secretary whereby the Secretary will pay a portion of the rent on behalf of qualified members.

The copy of the Occupancy Agreement attached to the *Complaint* includes a "Lease Amendment" letter dated October 4, 2006 (**Lease Amendment**), from "Cert Occup Specialist" Terry L. Carvalho, and "accepted" by Tauala on November 13, 2006, which states that, as of 1/1/2007 and through 1/1/2008, based on Tauala's income and family composition and the "Form 50059 Owner's Certification of Compliance with HUD's Tenant Eligibility and Rent Procedures" used to calculate Tauala's rent and rental assistance, Tauala's "monthly rent has been adjusted as follows:"

| | |
|---|---|
| Contract Rent | $ 550 |
| Utility Allowance | $ 97 |
| Assistance Payment | $ 476 |
| Total Tenant Payment | $ 171 |
| Tenant Rent | $ 74 |

Tauala asserts that her monthly payment was $74.00, at least through the end of 2007, pursuant to this Lease Amendment.

The "Accounting" attached as a further exhibit to the Complaint appears to be calculated based on the full monthly carrying charge set forth in the September 1996 Occupancy Agreement, rather than the amount set forth in the later Lease Amendment, beginning in or about March of 2007. With a January 23, 2008 filing in the District Court, Tauala submitted a December 1, 2006 letter from HPL Senior Property Manager Francine Martiniz (**Martiniz**), notifying Tauala of a "rent increase" to $624.00 effective February 1, 2007, due to alleged "underutilization" of Tauala's unit. Tauala contends that the "unilateral" rent increase violates a written agreement between the parties, *i.e.*, the Lease Amendment.[4]

---

[4] We note, although not directly germane to the issues before us, that the record on appeal contains a Declaration from Ms. Martiniz attesting to both a payment history for Tauala showing, *inter alia*, monthly payments by Tauala throughout 2007 (and into 2008) in the amount of $74.00, and an overlapping "Accounting" which appears not to reflect most of those payments.

On November 7, 2008, HPL's attorney, Richard A. Yanagi, Esq. (**Yanagi**), submitted a declaration stating, in part:

> I am informed and believe:
> a.     [Tauala] was receiving a Section 8 rental subsidy and paying $74.00 per month in rent.
> b.     [Tauala's] subsidy was terminated and her rent increased to $624.00.

On the same day, as an attachment to Yanagi's Declaration, Martiniz submitted a declaration attesting to exhibits showing Tauala's payment history and the "Detailed Aged Receivable" for Tauala's account. Martiniz did not attest to the alleged termination of Tauala's Section 8 subsidy. Neither declarant provided any documentation regarding such termination.

It is undisputed that Tauala refused to pay the increased monthly amount demanded in Martiniz's letter, but continued to make monthly payments of $74.00. After the lawsuit was filed, upon HPL's motion, the District Court ordered Tauala to pay $624.00 monthly into a rent trust fund. Tauala made the rent trust fund payments for three months, but discontinued making the trust fund payments thereafter.[5]

C.     <u>The Relevant Procedural History</u>

On October 5, 2007, HPL filed a summary possession complaint (**Complaint**) against Tauala, contending that Tauala had broken a "rental agreement" with Makalapa Manor. The Complaint alleges that, as of its filing, Tauala owed unpaid rent in the amount of $4,420.00, plus another $120.00 in late charges. The Complaint further alleges that written notice was given to Tauala on September 20, 2007 to correct the situation "as specified in the rental agreement or statute(s)." The written notice, in the form of a letter from Yanagi, indicates that the letter was mailed to Tauala on September 20, 2007 by first class mail and certified mail, return receipt requested, and states, *inter alia*:

---

[5]     It appears that, at that time, Tauala's total monthly income, from Social Security, was $623.00.

This letter demands payment of the $4,540.00. Unless payment of the Unpaid Rent is made within ten (10) days of your receipt of this letter, your tenancy and the rental agreement will be terminated and she [sic] is hereby given notice to vacate the Premises by Wednesday, October 3, 2007. You have ten (10) days within which to discuss the proposed termination of tenancy with the Landlord.

If you remain in default, then I intend to bring a summary proceeding for proceeding for possession of the Premises or other proper proceeding, action or suit for possession and/or other relief. . . .

On November 1, 2007, Tauala filed *pro se* the Motion to Dismiss, including a declaration stating the nature of her claimed interest as an owner of her Cooperative unit. HPL filed a memorandum in opposition, arguing that Tauala is not the owner of the premises, rather she is a tenant, and title is not in dispute. HPL argued, *inter alia*, that Tauala's "equity" was "as a member of and in the Corporation, which remains after termination of her Occupancy Agreement, as set forth in the Bylaws." The District Court orally denied Tauala's motion to dismiss at a November 9, 2007 hearing.

At the hearing on November 9, 2007, Tauala sought a continuance of the November 16, 2007 trial date, in order to try to secure an attorney to represent her. The District Court granted a brief continuance and *sua sponte* ordered that Tauala pay $624.00 monthly into a rent trust fund. Further continuances were granted at HPL's request. Later in the proceeding, when Tauala apparently could no longer afford to continue the trust fund payments, the Judgment for Possession and Writ of Possession were entered. Tauala timely filed a notice of appeal.

II.  POINTS OF ERROR

On appeal, Tauala raises the following points of error:[6]

1.  The District Court erred in denying her motion to dismiss for lack of jurisdiction;

2.  The District Court erred by "failing to equally review both parties' documents before deciding";

3.  The District Court erred in establishing a rent trust fund without affording Tauala the protections of Hawaii Revised Statutes (**HRS**) § 666-21 (1993);

4.  The District Court erred by applying HRS § 666-21 in a manner that violated Tauala's constitutional rights under the Fourteenth Amendment to the United States Constitution and article I, section 5 of the Hawai'i Constitution;

5.  The District Court judge erred by not recusing himself *sua sponte* and exhibited bias in his dealings with Tauala; and

6.  The District Court erred in disregarding HPL's breach of the terms of the Lease Amendment.

III. APPLICABLE STANDARDS OF REVIEW

"The existence of jurisdiction is a question of law that [the appellate court reviews] de novo under the right/wrong standard."  Captain Andy's Sailing, Inc., v. Dep't of Land & Natural Res., State of Hawai'i, 113 Hawai'i 184, 192, 150 P.3d 833, 841 (2006) (internal quotation marks and citation omitted).

"Interpretation of a statute is a question of law which we review de novo."  Kikuchi v. Brown, 110 Hawai'i 204, 207, 130

_____

[6]    The points of error set forth in Tauala's opening brief fail to comply with Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 28(b)(4). Generally, "failure to comply with HRAP Rule 28(b)(4) is alone sufficient to affirm the [trial] court's judgment." Morgan v. Planning Dep't, County of Kauai, 104 Hawai'i 173, 180, 86 P.3d 982, 989 (2004). Nonetheless, this court observes a policy of affording *pro se* litigants the opportunity "to have their cases heard on the merits, where possible." O'Connor v. Diocese of Honolulu, 77 Hawai'i 383, 386, 885 P.3d 361, 364 (1994).

P.3d 1069, 1072 (App. 2006) (internal quotation marks and citation omitted).

IV.  DISCUSSION

A.  District Court Jurisdiction

Tauala contends that she was a homeowner, not merely a renter, and therefore, pursuant to HRS § 604-5(d) (Supp. 2007),[7/] the District Court lacked jurisdiction over this matter. Tauala relies on Queen Emma Found. v. Tingco, 74 Haw. 294, 845 P.2d 1186 (1992) (**Queen Emma**), to support her argument.

In Queen Emma, the appellants were lessees under long-term residential ground leases. Id. at 301, 845 P.2d at 1189. The lessor-appellee filed complaints for summary possession in district court, based upon material breaches of the subject lease agreements, and sought cancellation of the leases, recovery of possession of the premises, and certain damages. Id. at 296-300, 845 P.2d at 1187-89. The Queen Emma appellants cited HRS § 604-5(d) and argued that the district court did not have subject matter jurisdiction because, inter alia, the cases involved a question of title to real property. Id. at 297, 845 P.2d at 1188.[8/] The district court assumed jurisdiction pursuant to HRS chapter 666 and granted various relief to the lessor. Id. at 298-99, 845 P.2d at 1188-89.

On appeal, the Hawai'i Supreme Court stated the nature of summary possession proceedings:

> Summary possession is a statutory proceeding that enables a landlord to regain possession of his property and remove any tenant who is wrongfully in possession of the land in question. . . . The purpose of a summary possession proceeding is to provide a prompt remedy for landlords against tenants who have violated a material condition of

---

[7/]  HRS § 604-5(d) (1993) provides, in relevant part that "[t]he district courts shall not have cognizance of real actions, nor actions in which the title to real estate comes in question[.]"

[8/]  The Queen Emma appellants also argued that the district court lacked the jurisdiction to exercise equity powers in fashioning a remedy. 74 Haw. at 299 n.6, 845 P.2d at 1189 n.6.

their lease or have wrongfully withheld possession after expiration of the lease.

Id. at 300, 845 P.2d at 1189.

The court further explained:

> HRS chapter 666, the summary possession statute, was enacted to provide **an expedient remedy** to restore a landlord to the possession of his premises **when it is clear that the tenant holds nothing more than a possessory interest in the property**. When a long-term ground lease is involved, the **lessee often holds more than a possessory interest** and the **relationship between the landlord and tenant may be more complex**. In the present case the district court remedy of **summary possession is ill-suited to protect the rights and determine the obligations of all parties with an interest in these long-term leasehold estates.**

Id. at 304, 845 P.2d at 1190-91 (emphasis added, footnote omitted).

In Queen Emma, the district court exceeded its legal authority when it attempted to fashion an equitable remedy in order to avoid the harsh result of the summary possession, which was essentially a lease foreclosure. Id. at 305, 845 P.2d at 1191. As the supreme court observed:

> **The inequity that the district court strived to avoid was the prospect that the Appellants would, in a summary manner, be dispossessed of a valuable property right upon which they relied in building their homes.** The "Surrender" provision of the lease provided that a defaulting lessee has no entitlement to the improvements once the lease is cancelled. Therefore, if the district court granted summary possession in favor of [the lessor], under the lease agreements with Appellants, [the lessor] would be entitled to the Appellants' homes.

Id. (emphasis added).

In order to protect valuable property rights that would be subject to loss in a summary manner, the supreme court concluded that the district court lacked jurisdiction over the dispute in Queen Emma:

> We hold today that long-term residential ground leases, such as those held by Appellants, cannot be cancelled or forfeited in a district court summary possession action under HRS chapter 666. In contradistinction, actions to dispossess lessees involving short-term rental agreements or other leases that grant lessees solely the right of possession may only be adjudicated in district court, pursuant to HRS § 666-6.

> This is because <u>such actions cannot be characterized as involving title to property or a right of property beyond mere possession</u>. Because HRS § 604-5(d) limits the civil jurisdiction of the district court by excluding real actions or actions involving title to real property, the only court that may take cognizance of actions seeking the cancellation or forfeiture of the Appellants' leases is the circuit court.

<u>Id.</u> at 305-06, 845 P.2d at 1191 (emphasis added, footnote omitted); <u>cf.</u> <u>Lum v. Sun</u>, 70 Haw. 288, 769 P.2d 1091 (1989) (district court had jurisdiction over the summary possession against a tenant under a six-year lease of a residential property owned by the landlord).

In the case now before us, at first blush, HPL's argument that Tauala was not an owner of the premises – and therefore this is simply a landlord-tenant case over which the District Court had jurisdiction – is appealing. The Cooperative appears to "own" the housing project,[2] Tauala owned only a membership in the Cooperative, *i.e.*, she owned a 1% stock-like interest in the Cooperative corporation, and Tauala occupied the premises pursuant to the terms of the Occupancy Agreement. The Occupancy Agreement, in particular the default provision, includes an express agreement that a landlord-tenant relationship exists between the Cooperative and Tauala. HPL also points out that the Occupancy Agreement and/or By-Laws require a member to get the Cooperative's consent prior to making structural alterations to the premises or transferring a membership.

Nevertheless, putting this case in the contextual framework set forth in <u>Queen Emma</u>, it is not "clear that [Tauala] holds nothing more than a possessory interest in the property." <u>See</u> <u>Queen Emma</u>, 74 Haw. at 304, 845 P.2d at 1191. The relationship between Tauala and the Cooperative is clearly, and by design, more complex than the typical short-term landlord-

---

[2]    Although the record contains no deed or other document directly evidencing title, this issue does not appear to be in dispute. Various documents, including a HUD Regulatory Agreement for Nonprofit Mortgagors and the Occupancy Agreement, refer to Makalapa Manor as the project owner.

tenant relationship in which the lessee is granted "solely the right of possession." Id. at 305-06, 845 P.2d at 1191. As discussed above, membership in the Cooperative was intended to provide a way for low-income and displaced families to: (1) participate in a form of housing ownership; (2) experience the pride of ownership; (3) invest in their housing in a way that will accrue equity; (4) benefit from the same federal income tax advantages as other homeowners; and (5) be able to sell their interest and right of occupancy. Cooperative members were told that they, collectively, would be their own landlords, they would pay monthly carrying charges (not rent) based on the Cooperative's income and expenses, and they could leave their membership to their loved ones when they died. Although nominally stating a three-year term, the Occupancy Agreement provided for the automatic and apparently perpetual renewal of the three-year term, indeed a long-term agreement.

Ownership of a cooperative membership, combined with the right to occupy a unit in the cooperative project, is a form of property ownership, even though cooperative owners do not directly hold the title to their properties. This form of home ownership is unlikely to have the economic value of fee simple ownership or a conventional long-term leasehold interest, but it has value and constitutes a right of property beyond mere possession. Indeed, for some low-income families, it may be the only form of home ownership that is economically possible. Based on the Hawai'i Supreme Court's reasoning in Queen Emma, and the HRS § 604-5(d) limits on the civil jurisdiction of the District Court, we conclude that a cooperative member's right to occupy their cooperative unit cannot be cancelled or terminated in a district court summary possession action.[10] The only court that

---

[10]    In the District Court proceeding, HPL argued that Tauala's equity as a member of the Cooperative remains after the termination of her rights under the Occupancy Agreement. The By-Laws require prompt delivery of the
(continued...)

may take cognizance of such actions is the circuit court. <u>See</u> <u>Queen Emma</u>, 74 Haw. at 305-06, 845 P.2d at 1191.

Courts in some other jurisdictions have similarly concluded that members or shareholders in a cooperative apartment corporation hold a unique form of real property ownership, and their relationship to the cooperative is not merely a landlord-tenant relationship. <u>See</u>, <u>e.g.</u>, <u>Kadera v. Superior Court</u>, 187 Ariz. 557, 931 P.2d 1067 (Ariz. App. 1997) (holding that Arizona's landlord-tenant statute did not apply to cooperatives, summary possession proceedings could not be used, and shareholders in a cooperative corporation had an interest in real property, rather than tenants' interest, even though legal title to the land was held by the cooperative); <u>Plaza Road Cooperative, Inc. v. Finn</u>, 201 N.J. Super. 174, 492 A.2d 1072 (N.J. Super. App. Div. 1985) (affirming dismissal for lack of jurisdiction and holding that the relation between a cooperative apartment association and a member-occupant is not that of a landlord and tenant for purpose of a summary dispossession action and that cooperative ownership is a form of property ownership); <u>Kohler v. Snow Village, Inc.</u>, 16 Ohio App. 3d 350, 475 N.E.2d 1298 (Ohio App. 1984) (holding that Ohio's landlord-tenant act was not applicable to cooperative housing corporations because an occupancy agreement was not a rental agreement, but concluding that certain restrictions on the alienation of property interests in the cooperative were not unconscionable). Other jurisdictions have declined to distinguish the relationship between a

---

[10]/(...continued)
membership certificate to the Cooperative upon termination of a member's rights under the Occupancy Agreement, and grant the Cooperative a unilateral option to "repurchase" the membership for an amount that is unrelated to any market value the membership might otherwise have and that is conclusively determined by the Cooperative. If the membership certificate is not so delivered within 10 days after demand, the membership is deemed to be cancelled and may be reissued by the Cooperative to a "new purchaser." Thus, it appears the value of any equity interest retained after the termination of rights under the Occupancy Agreement is greatly diminished or, arguably, illusory.

cooperative corporation and its shareholders/members as anything more than a landlord-tenant relationship and, accordingly, have allowed summary possession proceedings to be maintained. See, e.g., Village Green Mut. Homes, Inc. v. Randolph, 361 Md. 179, 193-194, 760 A.2d 716, 724 (Md. 2000) ("We hold that, generally, in Maryland, the relationship created by an occupancy agreement between a housing cooperative and its membership is that of landlord-tenant and that, generally, a member holds a leasehold, rather than a fee simple interest in an apartment she or he occupies. . . . Accordingly, actions for the restitution of possession of the premises that involve cooperatives may be maintained in the District Court."); Susskind v. 1136 Tenants Corp., 43 Misc. 2d 588, 591, 251 N.Y.S.2d 321, 326 (N.Y. City Civ. Ct. 1964) ("[New York] courts have declared the relationship between a cooperative corporation and its stockholder to be one of landlord and tenant in allowing the former to maintain summary proceedings against its tenant shareholder.") (citations omitted); Quality Management Servs., Inc. v. Banker, 291 Ill. App. 3d 942, 946, 685 N.E.2d 367, 370 (Ill. App. Ct. 1997) ("We see no reason to treat the proprietary lease or occupancy agreement differently than other leases for purposes of the [Landlord-Tenant] Act simply because it has been paired with an ownership interest in the [cooperative] corporation which holds title to the real estate."); Brandywine Townhouses, Inc. v. Joint City-County Bd. of Tax Assessors, 231 Ga. 585, 587, 203 S.E.2d 222, 224 (Ga. 1974) ("Although a [cooperative] member does possess some characteristics of ownership, the terms of the occupancy agreement also limit the rights of each member in many respects inconsistent with ordinary elements of ownership."). Although it appears that this latter view is in the majority, we conclude that recognition of cooperative membership as a form of property ownership, not subject to summary possession proceedings, is more consistent with Hawai'i jurisprudence.

Accordingly, we conclude that the District Court lacked subject matter jurisdiction over HPL's action and, on remand, the District Court must dismiss the case.

B.    The Other Issues Raised by Tauala

In light of our conclusion that the District Court lacked jurisdiction over this case, we need not address the other points of error raised by Tauala on appeal.

V.    CONCLUSION

For these reasons, we vacate the District Court's November 17, 2008 Judgment for Possession and Writ of Possession and remand the case for further proceedings consistent with this opinion.

On the briefs:

Regina P.D. Tauala
Pro Se Defendant-Appellant

Richard Yanagi
for Plaintiff-Appellee