ASSOCIATED ESTATES CORPORATION, APPELLEE, *v.* BARTELL, APPELLANT.

(No. 48618—Decided February 25, 1985).

*Victor M. Javitch,* for appellee.
*Jane Mack, Peter M. Iskin* and *Legal Aid Society of Cleveland,* for appellant.

PRYATEL, J. Laura Bartell, defendant-appellant, is a tenant who has

resided with her three and one-half-year-old daughter at Lakeshore Village Apartments in Cleveland since October 1981. Lakeshore Village Apartments, which consists of one hundred eight units, is heavily federally subsidized by the Department of Housing and Urban Development ("HUD") since it houses low-income families and disabled persons under age sixty-two.

In February 1983, defendant entered into a one-year written lease with Associated Estates Corporation, plaintiff-appellee. Defendant was required to pay $7 monthly rent while HUD paid the balance of $524. The lease provided that the term would run from April 1, 1983 to March 31, 1984 unless "automatically terminated as permitted by paragraph 23 of this Agreement." According to paragraph 23, the landlord can terminate the lease only for the tenant's (1) material noncompliance with the lease terms; (2) material failure to carry out obligations under the State Landlord and Tenant Act; or (3) for "other good cause." Paragraph 23 further provides that the landlord is required to give the tenant thirty days' written notice and if an eviction is initiated the landlord can only rely on the grounds cited in the notice.

Two days before Christmas (on December 23, 1983), defendant invited her boyfriend and another friend, Jim Spear, to her apartment. Jim Spear invited four other people (John Davis, Lois Davis, Eddie Todd and Mike Bolin) to join them. Defendant asked everyone to leave at about 10:00 p.m. since they had been drinking beer for an hour and were starting to get loud. A scuffle broke out in the hallway, and beer cans were allegedly left in the hallway.

Defendant's boyfriend and Jim Spear remained in defendant's apartment while the others left. At approx-imately 2:30 a.m. at least two of the "guests" returned to defendant's apartment, banged on defendant's door, gouged holes in it, and broke the windows on another tenant's car. Defendant was charged $200 in material and labor to replace the door. Defendant filed a complaint at the city prosecutor's office against these persons for the damage to her apartment door.

Based on the events of December 23, 1983, plaintiff served a thirty-day eviction notice on the defendant to leave the premises as of January 27, 1984. Plaintiff then served defendant, on January 30, 1984, with a three-day notice to vacate the premises. The reason stated for the eviction was "serious, repeated damage to unit, repeated disturbance."

Defendant spoke with management about her eviction at a meeting that was held about two weeks after she had been served notice to vacate. Defendant tried to explain what happened, but was told that there were complaints made against her and that her behavior would no longer be tolerated.

Despite the eviction notice, defendant continued to reside in her apartment and deposited rent checks for the months of January, February and March into plaintiff's bank account with Banc-Ohio. These checks were cashed respectively by BancOhio on January 3, 1984, February 2, 1984 and February 29, 1984. Plaintiff receives a computer printout from BancOhio by the tenth or twelfth of each month which advises plaintiff whether a tenant has paid his rent.

On March 8, 1984, Rudy Bratina, property manager of Lakeshore Village Apartments, delivered to defendant a check for $21[1] to refund the January, February and March rental payments she had deposited. Defendant did not ac-

---

[1] Apparently, the plaintiff is not required to tender back HUD's share of the rent ($1572 for three months) so long as the suite is occupied.

cept this check. Instead, defendant continued to pay rent for the month of April. Plaintiff's bank cashed defendant's April rental check on April 4, 1984.[2]

At trial, plaintiff called three employees of Lakeshore Village Apartments to the witness stand. Rudy Bratina, property manager, testified that he had warned defendant, in October 1982 and December 1983, that her television was too loud, there was "too much disturbance coming from the suite" and she was "disturbing the residency of the building." Bratina contended that he had received complaints concerning the noise level from other tenants.

Cathy Palmer, who was responsible for taking rental applications from prospective tenants and forwarding them to management, testified that when tenants sign their lease they are given (1) a HUD form to calculate their rent; and (2) a resident handbook of HUD rules. She further testified that she had received three or four complaints from October 1983 to December 1983 concerning "noise, disturbances, drinking, beer in the hallways." Finally, Palmer testified that she had defendant's car towed on March 6, 1984 because the car did not display the required stickers, and that at the time it was towed she did not know that the car belonged to defendant.

Donald Wayne Crawford, a security guard employed by plaintiff since January 1984, testified, over objection, that on several occasions he observed defendant and defendant's friends "going up and down the stairs between apartments carrying bottles of liquor, cans of beer, laughing loudly, hollering, shoving one another." He further testified that on March 23, 1984, defendant attended a "loud party" at a friend's apartment and later that evening, at about 1:30 a.m., he observed defendant and three friends enter defendant's automobile. According to Crawford, defendant sat in her car for ten minutes and "revved the engine" while her friends laughed. Plaintiff counsel objected to Crawford's testimony on the ground that it was irrelevant since his employment began after defendant was served with notice to vacate and since federal law prohibits reliance on grounds other than those listed in the notice. The trial court overruled plaintiff's objection.

Defendant conceded that she had been warned by the superintendent in 1982 that her radio was too loud and had been told by a security guard on two occasions in 1983 to turn her television down. As to December 23, 1983, defendant admitted that fighting took place for a few minutes in the hallway but denied that beer cans had been left there. Insofar as March 23, 1984 is concerned, defendant explained that she had left the motor running on her car so that the car would warm up.

The trial court entered final judgment in favor of plaintiff on its forcible entry and detainer complaint.

Defendant raises five assignments of error.

### Assignment of Error No. I

"I. Associated Estates Corporation waived its notice to vacate by accepting rent in advance for Ms. Bartell's occupancy after its service of notice to vacate."

Appellant maintains that appellee waived the statutory three-day notice requirement and that the trial court was consequently without jurisdiction to hear this matter. We agree.

---

[2] Appellee contends that it tendered a check for $7 to the Cleveland Municipal Court, Housing Division as a refund to appellant for April's rent. However, at trial, there was no evidence to this effect, nor was any check admitted representing the alleged refund of April's rent.

Proper service of the three-day notice to vacate the premises is a condition precedent to the commencement of a forcible entry and detainer action. R.C. 1923.04; *Sternberg* v. *Washington* (1960), 113 Ohio App. 216, 221 [17 O.O.2d 185]. Hence, if the lessor waives the notice to vacate, the action has not been properly commenced and the trial court commits reversible error if it proceeds on the merits of the case.

Generally, whether the landlord waives the notice requirement is a question of fact. *Presidential Park Apts.* v. *Colston* (App. 1980), 17 O.O. 3d 220, 221. By accepting *"future rent payments,"* after serving a notice to vacate, the landlord is deemed to have waived the notice to vacate as a matter of law since such acceptance is inconsistent with the landlord's notice to vacate. *Id.* The landlord does not waive the notice to vacate if, during pendency of the suit, the landlord accepts rent from a tenant in occupancy for "liability already incurred." *Id.*

In the instant case, appellee served appellant the three-day notice to vacate on January 30, 1984. Although appellee, through its bank, cashed appellant's rental checks for three months following service of the notice (*i.e.,* February, March and April), appellee nevertheless contends that it did not waive its notice to vacate because it tendered back the rental payments deposited by appellant. Appellee maintains that final acceptance of rental checks does not occur until it notifies the bank of such a fact and that the temporary retention of appellant's money did not constitute an acceptance of the rent since appellee tendered a refund of appellant's rental payments prior to the commencement of trial.

Appellee's argument is without merit. Insofar as the bank is concerned, there is no evidence in the record, nor in the lease agreement,[3] to support appellee's claim that acceptance of rental checks is temporary until the bank is notified by appellee. Where a contract provides for a lessee to deposit funds in the lessor's bank account, and such funds are so deposited, *the funds become the property of the lessors unless the bank is given contrary instructions from the lessor. Kachelmacher* v. *Laird* (1915), 92 Ohio St. 324, 335. Since there is no evidence that such "contrary instructions" were given, the rental payments, when accepted by the bank, were effectively passed to appellee. *Id.*

The act of cashing a check constitutes acceptance (*First Natl. Bank & Trust Co.* v. *Fireproof Warehouse & Storage* [1983], 8 Ohio App. 3d 253) and cannot be negated merely by tendering back a subsequent check. There is no acceptance where a landlord never cashes a check but instead retains it for evidentiary purposes and tenders it back on the day of trial. *Booher* v. *Lowe* (1947), 82 Ohio App. 392, 394 [38 O.O. 58]. However, this is not the case where rental checks have already been cashed.

Since appellee accepted *future rent payments* from appellant following service of the notice to vacate the premises, appellee has waived the statutory requirement of notice. Hence, the action did not commence and the trial court committed reversible error in hearing this case.

Appellant has raised four other assignments of error. While these assignments are moot in light of our ruling on this assignment of error, they will nevertheless be discussed as required by App. R. 12(A).[4]

---

[3] The lease merely provides that rent is "due the 1st day of the month at A.E.C. Management Co., 600 Beta Dr., Mayfield Village, Ohio 44143."

[4] App. R. 12(A) provides, in pertinent part:

"* * * All errors assigned and briefed shall be passed upon by the court in writing,

Assignments of Error Nos. II and III

"II. AEC failed to give Ms. Bartell notice of the specific conduct on which it proposed termination of the lease, in violation of the requirements of federal law and the lease.

"III. AEC relied upon grounds not cited in the notice of termination, in violation of federal law and the lease."

To properly terminate the tenancy in the instant case, appellee was required to follow the procedures set forth in the lease agreement. Since appellee participated in HUD's federal subsidy program, appellee obligated itself to act in accordance with federal rules and regulations.

Both the lease agreement and the rules and regulations set forth by HUD mandate that the landlord's termination notice must "state the grounds for termination *with enough detail for the tenant to prepare a defense.*"[5]

The purpose of requiring that the notice state reasons for the termination is "to insure that the tenant is adequately informed of the nature of the evidence against him so that he can effectively rebut that evidence." *Escalera* v. *New York City Housing Authority* (C.A.2, 1970), 425 F. 2d 853, 862, certiorari denied (1970), 400 U.S. 853.

Hence, termination notices have been found to be insufficient where they contain only one sentence, are written in "vague and conclusory" language, and fail to set forth a factual statement of the reason for termination. For in-

stance, in *Housing Authority of DeKalb Cty.* v. *Pyrtle* (1983), 67 Ga. App. 181, 306 S.E. 2d 9, the notice stated as the reason for termination:

" '* * * [r]epeated incidents of intoxication and irresponsible use of the kitchen facilities in your Unit [which] have imposed a threat [to] the peaceful enjoyment and safety of your neighbors. * * *' " *Id.* at 183, 306 S.E. 2d at 10-11.

The court found that the notice was insufficient since it did not "provide the tenant with knowledge of the circumstances upon which the termination of the lease was predicated sufficient to afford the tenant an opportunity to prepare a meaningful rebuttal."[6] *Id.*

In the instant case, appellant's notice provided that her lease was to be terminated because of *"[s]erious, repeated damage to unit. Repeated disturbance."* (Emphasis added.)

Since this notice is blanketed in broad language and does not refer to specific instances of conduct, it is inadequate and therefore denied appellant procedural due process.

Moreover, the trial court erred in admitting into evidence, over objection, the testimony of Donald Wayne Crawford, as to events that took place subsequent to the notice of termination. Appellee contends that such testimony is relevant since it provides a course of conduct. However, the lease and federal rules provide that if an eviction is initiated, the landlord agrees to rely only on those grounds cited in the termina-

---

stating the reasons for the court's decision as to each such error."

[5] See Occupancy Requirements of Subsidized Multifamily Housing Programs 4350.3, Paragraph 4-20a(2).

[6] See, also, *Housing Authority of County of King* v. *Saylors* (1978), 19 Wash. App. 871, 873, 578 P. 2d 76, 78, where the following notice was found insufficient:

"You are in violation of your lease in sec-

tion 6j: The Tenant shall not commit or maintain a nuisance on or about the premises."

See, also, *Escalera, supra,* where the tenants were notified that their lease was to be terminated due to:

"'* * *' Record of antisocial activities and arrests of your son, Fred, Jr., constituting a threat to the peace and safety of the community * * *' " and "'* * *' Illegal acts of Mr. Humphrey, having an adverse effect on the project and its tenants.' " *Id.* at 858, fn. 2.

tion notice. Section 880.607(b)(3), Title 24, C.F.R. To admit such testimony as to a "course of conduct" would, in effect, negate the purpose of providing advance notice since the tenant would not be able to effectively challenge the events which took place subsequent to the notice. Therefore, the trial court should have held such testimony to be irrelevant and excluded it from evidence.

Assignments of Error Nos. IV and V

"IV. AEC failed to prove by a preponderance of evidence the requisite good cause for terminating Ms. Bartell's tenancy.

"V. Equitable considerations require judgment in Ms. Bartell's favor to avoid forfeiture of their tenance [*sic*] and leasehold rights."

The lease provides that the agreement can be terminated only for:

"1. the Tenant's material noncompliance with the terms of this Agreement;

"2. the Tenant's material failure to carry out obligations under any State Landlord and Tenant Act; or

"3. other good cause, which includes but is not limited to the Tenant's refusal to accept the Landlord's proposed change to this Agreement."

Appellant maintains that a finding of "good cause" is a requisite element of appellee's claim. However, we find that appellee's reason for terminating the lease ("serious, repeated damage to unit, repeated disturbance") was not based on "good cause" but instead involved the tenant's "material noncompliance" with the terms of the lease. According to the lease, "Material noncompliance" includes "serious or repeated damage to the unit or common areas (and) serious or repeated interference with the rights and quiet enjoyment of other tenants."

Nevertheless, we agree that the judgment is not supported by sufficient evidence. Appellant was the only witness who testified from firsthand knowledge as to the events of December 23, 1983. Although the court did not err in admitting into evidence Rudy Bratina's and Cathy Palmer's testimony that they received complaints from other tenants, the substance of these complaints should have been excluded as hearsay.

Moreover, appellant should not be penalized for the acts of uninvited "guests." According to the resident handbook, a tenant is responsible for the conduct of her "guests" in her apartment or in or around the public areas and grounds. In *ABC Management Co.* v. *Gamble* (Dec. 15, 1983), Franklin Cty. M.C. No. 83AP-788, unreported, the court held that the tenant was not responsible for the acts of an *uninvited "guest."* In the instant case, since the people who damaged appellant's door and another tenant's car windows were uninvited and in light of the fact that appellant brought criminal charges against them, they cannot be deemed "guests" and appellant is not responsible for their actions.

Finally, appellant maintains that equity requires judgment to be rendered in her favor. However, since there is an adequate remedy at law, equity will not intervene. *Belden* v. *Modern Finance Co.* (App. 1945), 44 Ohio Law Abs. 163, 164.

The judgment of the trial court is reversed.

*Judgment reversed.*

MARKUS, P.J., concurs.

NAHRA, J., dissents.