GVOZDANOVIC, Appellant and Cross–Appellee,

v.

WOODFORD CORPORATION, Appellee and Cross–Appellant.

[Cite as *Gvozdanovic v. Woodford Corp.* (2000), 139 Ohio App.3d 11.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–990574.

Decided May 19, 2000.

12

*Finney, Bacon & Stagnaro* and *Paul T. Saba,* for appellant and cross-appellee.

*Kevin P. Roberts* and *James J. Condit,* for appellee and cross-appellant.

PAINTER, Judge.

Ohio has no settled law concerning how a cooperative housing association should remove a tenant/shareholder when the shareholder has breached the

lease. We attempt here to resolve the issue. In doing so, we have written rather more than is our custom, and stated the facts in more detail, because we believe it necessary in this unusual case.

This case involves the deteriorating relationship between a corporation and one of its shareholders under a cooperative housing arrangement. A cooperative is neither a freehold nor a condominium. It is a "multi-unit dwelling in which each resident has (1) an interest in the entity owning the building and (2) a lease entitling him to occupy a particular apartment within the building."[1]

Private cooperative housing arrangements are a rare species in Ohio. No specific legislation governs them. The case law is also sparse. With these difficulties, we do our best to fit this "square peg" into the "round holes" provided by the legislature and the common law.

We hold that either forcible entry and detainer, under R.C. Chapter 1923, or ejectment, under R.C. 5303.03, may be used to evict a member of a housing cooperative. Though one method may be preferable given the circumstances of individual cases, they are both proper vehicles.

Though we affirm in part, we also remand, because the trial court's order provided an incomplete remedy to the cooperative association and failed to address the issue of the member's shares in the cooperative association.

## I. Gvozdanovic's Purchase

Appellee Woodford Corporation is the owner and operator of a housing cooperative. (Woodford's property consists of six apartment buildings and a two-story house, all in proximity.) The shareholders of Woodford are the cooperative members who reside in the housing units. Each member's stock is directly related to the particular apartment unit in which the member resides. The price paid by the member for each share of stock reflects the fair market value of the member's corresponding apartment unit. Upon purchasing stock in Woodford, a member enters into a lease for the apartment unit associated with the member's share of stock.

Appellant Marinko Gvozdanovic is a member shareholder in the cooperative, holding two shares of Woodford stock relating to the house, Building G, which is equivalent to two housing units. Gvozdanovic contracted to purchase the shares relating to Building G from a former member. In conjunction with the purchase, he applied for membership in the Woodford Corporation and his application was approved. Woodford, through its officers, executed closing documents in relation to Gvozdanovic's purchase, including a mortgage and promissory note with

---

**1.** 15A American Jurisprudence 2d (1976) 889, Condominiums and Co–Operative Apartments, Section 59.

Kenwood Savings and Loan Association. To become a member of the cooperative, Gvozdanovic signed a lease for each unit comprising Building G and was given a copy of the Amended Code of Regulations of the Woodford Corporation and the House and Pool Rules.

## II. Gvozdanovic's Lawsuit and Woodford's Counterclaim

On June 4, 1996, Woodford notified Gvozdanovic, as required under the applicable provisions of the leases, that he was in default of his lease agreements, and that unless the defaults were cured the agreements would be terminated July 15, 1996. On July 10, 1996, Gvozdanovic sued Woodford, alleging invalidity of the lease agreements, discrimination in violation of the Fair Housing Act of 1988, and harassment. Gvozdanovic sought compensatory damages, punitive damages, and a declaration that Woodford's house rules were not binding on him and were contrary to law to the extent that they allowed only a member's immediate family, aged eighteen or older, to reside in a housing unit.

Woodford answered and counterclaimed, asserting that Gvozdanovic had breached the leases, the cooperative's regulations, and its rules. It asserted that Gvozdanovic had been notified of the breach and had been informed that his lease agreements would be terminated unless he cured the breach and that Gvozdanovic had failed to take corrective action. Woodford sought damages in an amount to be set forth at trial, the eviction of Gvozdanovic and anyone residing in his units, termination of Gvozdanovic's membership in Woodford, costs expended, attorney fees, and any other relief that the court deemed appropriate.

## III. Gvozdanovic's Escrow of Mortgage and Maintenance Payments

At one point during the lawsuit, Gvozdanovic deposited the mortgage and maintenance payments that he owed to Woodford with the clerk of courts. Gvozdanovic alleged that Woodford had failed to maintain Building G as he had requested and had discriminated against him by making defamatory remarks and by withholding services. Woodford applied for release of the monies, arguing that the mortgage and maintenance payments did not constitute rent under the Ohio Landlord–Tenant Act.[2]

The trial court ordered the release of the funds placed in escrow and further ordered that Gvozdanovic make all future payments directly to Woodford. The trial court identified both the original claims and the counterclaim as ones for breach of contract. It concluded that the Landlord–Tenant Act was inapplicable to cooperatives because members are not tenants as defined by the Act, but are owners, "making them a hybrid between landlord and tenant known as coopera-

---

2. See R.C. 5321.09 and 5321.10.

tor-residents." The trial court also focused on the fact that the leases did not contain the right to escrow funds.

## IV. The Parties' Pretrial Motions

Woodford moved for summary judgment on both the complaint and the counterclaim. It explained that its counterclaim was "based on [Gvozdanovic's] failure to pay monthly carrying charges, keeping a pet dog, subletting to others, conducting auto sales and creating a nuisance from revving engines in the course of those sales, performing unauthorized repairs to the units owned by [him], performing unauthorized construction and wall[ing] off units, financing over and above value, [and] allow[ing] persons other than family to reside on the premises," all in violation of the leases and the cooperative's regulations. Woodford's motion was supported by the affidavit of Betty Morris, President of the Board of Trustees of Woodford, and by excerpts from Gvozdanovic's deposition.

Gvozdanovic moved for summary judgment on Woodford's counterclaim, asserting that Woodford had failed to provide him adequate notice as required under the leases, that Woodford had waived the alleged defects in Gvozdanovic's performance by accepting monthly payments under the leases, that any breaches had been cured or were moot, and that eviction through the Landlord–Tenant Act was improper. Gvozdanovic supported his motion with various documents, his affidavit, and excerpts from the depositions of Woodford's secretary and Betty Morris.

Woodford filed its memorandum in opposition to Gvozdanovic's summary-judgment motion with supporting affidavits of Woodford's previous and current treasurers, both of whom averred that Gvozdanovic's mortgage and maintenance payments had never been made in advance.

Gvozdanovic sought leave to amend his complaint. He argued that the amendment would eliminate some claims, clarify others, and add recently discovered claims against Woodford, i.e., withholding services and corporate waste. Woodford opposed the motion.

## V. The Trial Court's Decision

The trial court denied Gvozdanovic's motion to amend his complaint and granted Woodford summary judgment on Gvozdanovic's claims. It also granted summary judgment to Woodford on its counterclaim "in all respects" except damages, which, the court declared, was a moot issue. (In its memorandum decision, the court explained that damages were moot because the contract did not provide for liquidated damages and because there was no separate cause of action for damages.)

While the judgment entry purports to grant Woodford summary judgment in all respects except damages, the trial court's memorandum indicates that Woodford was not entitled to summary judgment as to the termination of Gvozdanovic's membership, costs, or attorney fees. The trial court stated in the memorandum decision that cooperative apartment complexes "are governed strictly by contract principles," that Gvozdanovic had defaulted under the parties' agreement, thereby providing Woodford with "the right to re-enter and repossess" Building G, and that only the litigation commenced by Gvozdanovic "[had] kept Woodford from exercising its rights." It also found that because the leases did not specify that Woodford's acceptance of Gvozdanovic's monthly mortgage and maintenance fees waived its right of re-entry and repossession, a waiver did not exist.

The trial court also determined that because the leases provided that in the event of default Woodford had the right to re-enter and to repurchase the apartment at book value or proceed with its sale, Gvozdanovic's equity interest would be restored to him. It further stated that "[t]he within action focuses solely on the restitution of possession of the premises, not Gvozdanovic's equitable interest, which may be addressed in a separate action."

It also concluded that to allow Gvozdanovic to amend his complaint would prejudice Woodford, because even though Gvozdanovic had had three years to amend, he had waited to do so until the last day scheduled for the summary-judgment motions, and because granting the amendment would force the parties to return to the beginning stages of the litigation.

After granting Woodford's summary-judgment motion "as to re-entering and repossessing the unit," the trial court deleted from Woodford's proposed judgment entry a statement that "a ten-day writ of execution shall be issued pursuant to R.C. 1923.13 restoring possession of the premises to Defendant Woodford Corporation, and costs shall be assessed in its favor."

## VI. The Result of the Trial Court's Entry

The trial court's decision to focus only on the restitution of the premises and its refusal to issue a writ of restitution have resulted in a meaningless victory for Woodford. The judgment has no practical effect. Woodford won the lawsuit but accomplished nothing. It is clear from the arguments on appeal that Gvozdanovic is still in possession of Building G and his stock. A separate lawsuit has been filed to determine ownership of the stock. Surely, the result so far has been unacceptable from the standpoint of the law, the parties, and the courts.

## VII. The Appeals

Gvozdanovic has appealed and Woodford has cross-appealed. In his appeal, Gvozdanovic raises three assignments of error. In his first assignment, he

contends that the trial court erred by granting Woodford the right to re-enter and repossess Building G, because Woodford did not serve him with a notice to vacate the premises, as required under R.C.1923.04, and because Woodford's acceptance of future rent payments waived its right to eviction. In his second assignment, Gvozdanovic argues that the trial court erred by ordering him to sell his shares in the cooperative to Woodford at book value because the order forfeited his equitable interest in Building G without evidence that he acted willfully. Last, Gvozdanovic argues that the trial court abused its discretion by not granting him leave to file an amended complaint.

Woodford's cross-appeal raises two assignments of error. In its first assignment, it argues that the trial court erred by failing to grant it a writ of restitution to re-enter and repossess Building G. In its second assignment, Woodford contends that the trial court committed error by failing to rule on the disposition of Gvozdanovic's shares of stock.

## VIII. Housing Cooperatives

Before we can address the issues raised in this case and the applicability of R.C. Chapter 1923, we need to understand the strange hybrid known as a housing or apartment cooperative. Housing cooperatives have been in existence in the United States since the 1800s.[3] Their purpose is "to provide dwellers in thickly settled urban communities with some of the indicia of home ownership, together with the accompanying convenience and security, while freeing them from a large measure of the burdens and responsibilities inherent in the ownership and maintenance of a private residence in a large city."[4] As one commentator has explained, "[A] cooperative is defined as a multi-unit dwelling where each resident has an interest in the entity owning the building and a lease entitling him to occupy a particular apartment within the building."[5] Unlike a condominium unit owner who is a titleholder in fee, the cooperative member holds only a leasehold estate.[6]

Also, unlike housing cooperatives for which the Ohio legislature has not provided guidance, condominiums are regulated under R.C. Chapter 5311, which

---

**3.** Annotation, Transfer of, and Voting Rights in, the Stock of Co–Operative Apartment Association (1965), 99 A.L.R.2d 236, 237. (Some commentators have concluded that the concept was introduced following World War I. See 4 Thompson on Real Property [1994], 194, Section 36.05[b].)

**4.** Annotation at 237.

**5.** Fierro, Condominium Association Remedies Against A Recalcitrant Unit Owner (1999), 73 St. John's L. Rev. 247, 249–250.

**6.** *Id.* at 249, fn. 11.

provides the rights and duties of both the unit owners and the owners association that administers the condominium property. Under Ohio law, a condominium unit and the undivided interest a unit owner has in the common areas and appurtenant facilities are considered real property for all purposes.[7] The common areas and facilities are owned by the unit owners as tenants in common.[8] Consequently, unless the parties agree otherwise, the owners association is entitled to a lien upon a unit owner's estate or interest in any unit and "the appurtenant percentage of interest in the common areas and facilities" when an owner fails to pay common expenses.[9]

In a corporation-run cooperative, "[t]he legal title to the entire project is vested in a non-profit corporation, which operates and maintains the building and facilities and provides for financing."[10] As a result, "[w]hile the apartment is what the prospective purchaser seeks, what he actually receives is one or more shares of stock in the corporation, carrying the right to a proprietary lease in the apartment of his choice."[11]

The corporation has stock issued to it "of a total par value equal to the purchase price of the building. This stock is allocated between the individual units according to their relative value and, in a manner of speaking, becomes appurtenant thereto."[12] When a person "buys" an apartment or unit, he or she pays "a price equal to the money value of the physical apartment unit, not for the physical apartment itself, but for the shares in the corporation of an equal par value which are appurtenant to it."[13] The corporation "then executes a proprietary lease to the particular apartment unit 'purchased.' * * * The operating expenses of the co-operative building are divided among the individual apartment units."[14] Usually the corporation's by-laws, leases, and stock certificates prohibit the transfer of stock and the assignment of a lease independently of each other.[15]

---

7. R.C. 5311.03.

8. R.C. 5311.04.

9. R.C. 5311.18.

10. Wallace, Restrictions on the Use of Cooperative Apartment Property (1962), 13 Hastings L.J. 357, 358.

11. Anderson, Cooperative Apartments in Florida: A Legal Analysis (1957–1958), 12 U.Miami L.Rev. 13, 17.

12. Annotation at 237.

13. Annotation at 237.

14. Annotation at 237.

15. Annotation at 238.

Thus, the member does not own the unit (as a condominium owner does), but rents it from the corporation in which the member owns shares.

Among the disadvantages of being a cooperative member as opposed to a home or condominium owner are that the member "holds no legal title to his apartment, but is in reality a lessee whose possession under certain circumstances can be terminated against his will and through no fault of his own; that his investment [may be] frozen since cooperative stock [may not be] generally acceptable collateral; that he surrenders much of the sovereignty which the fee owner traditionally exercises over his home; and that the history of cooperative apartments, especially in time of recession, has been an unfortunate one."[16]

Although there are disadvantages to cooperative "ownership," the cooperative member, unlike a "regular" tenant, has certain proprietary rights which a mere tenant does not have: 1) most of the *attributes* of an owner; 2) a voice in the management and operation of the building; 3) voice in the selection or approval of other tenant-owners; 4) a vote in the important matter of any proposed sale or mortgage of the property; and, 5) most importantly, the exclusive, personal right to occupy her particular apartment.[17]

The cooperative member, however, has only the indicia of ownership, not absolute ownership.[18] As explained by one commentator,

"But in legal theory, * * * the corporation is distinct from its shareholders, no one of whom has a right to receive legal title to any specific property of the corporation under the better-drawn plans, and it is necessary that this distinction be observed in order to carry out the purposes of the cooperative."[19]

## IX. Summary Dispossession

### A. Ohio Law

There is a dearth of Ohio law concerning cooperative housing arrangements.[20]

---

16. Anderson, *supra*, at 14.

17. Phillip N. Smith, A Survey of the Legal Aspects of Cooperative Apartment Ownership (1961). 16 U. Miami L.Rev. 305, 315–316, quoting *Hicks v. Bigelow* (D.C.Mun.Ct.App.1947), 55 A.2d 924, 926.

18. *Id.* at 316.

19. *Id.* at 316, quoting 1 American Law Property of Property (Casner Ed.1952), Section 3.10, at 200.

20. Other jurisdictions have addressed similar problems by adopting the Uniform Common Interest Ownership Act or some modification of it. The Act applies to cooperatives, condominiums, and other planned unit communities. Under the Act, if a unit owner fails to pay his assessment fees, the "community association" may charge late fees, and, after a hearing, it

The Ohio Supreme Court in *State v. Silberberg* [21] determined that the sale of units in a cooperative corporation in which each unit owner was to have stock in the corporation in accordance with the value of his or her ownership constituted the sale of real estate, as opposed to the sale of securities. That case, however, did not discuss the relationship between the corporation and its owners.

In fact, the Eighth District Court of Appeals is the only court in Ohio that has considered that relationship in any detail. In *Kohler v. Snow Village, Inc.,* [22] the court determined that a cooperative apartment occupancy agreement was not a "rental agreement" as defined by R.C. Chapter 5321 (the Landlord–Tenant Act). The court looked at the characteristics of the cooperative apartment and recognized that it "is something of a hybrid between renting and owning, [and that] it would not be incorrect to state that the similarity is closer to the latter than to the former." [23] The court examined the definition of "rental agreement" under the Landlord–Tenant Act and concluded that the Landlord–Tenant Act "was enacted to specifically outline the rights possessed by landlords and tenants under the standard, traditional rental agreements," and did not "comfortably encompass the unique characteristics of the cooperative apartment." [24]

The court found a cooperative member to be distinguishable from a tenant in many ways. A member is both a landlord by virtue of being an owner of the cooperative and a tenant by virtue of the proprietary lease. A member's use and occupancy of an apartment is not based on rent payments. The member's monthly fee is not for the use and occupancy of the apartment, but to cover the member's share of the building's maintenance expenses and monthly mortgage. A rent amount is fixed while the member's fee is variable. A member's tax consequences in owning a share of the corporation are similar to home ownership in that the member pays real estate taxes and the mortgage interest paid on the building is tax deductible.[25] Further, if the member sells his or her interest at a

---

may levy fines for violations of the by-laws, rules and regulations; the failure to pay also creates a lien that generally has priority over all but a few liens on the unit, and the lien may be foreclosed on like a mortgage on real estate. See Winokur, Meaner Lienor Community Associations: The "Super Priority" Lien and Related Reforms under the Uniform Common Interest Ownership Act (1992), 27 Wake Forest L.Rev. 353.

21. *State v. Silberberg* (1956), 166 Ohio St. 101, 1 O.O.2d 221, 139 N.E.2d 342.

22. *Kohler v. Snow Village, Inc.* (1984), 16 Ohio App.3d 350, 16 OBR 400, 475 N.E.2d 1298.

23. *Id.* at 353, 16 OBR at 402, 475 N.E.2d at 1301.

24. *Id.* at 353, 16 OBR at 403, 475 N.E.2d at 1302.

25. *Id.* at 354, 16 OBR at 403–404, 475 N.E.2d at 1302.

profit, the profit can be treated as a long-term capital gain for tax purposes.[26]

After determining that the Landlord–Tenant Act was not applicable to apartment cooperatives, the Eighth Appellate District concluded that the occupancy agreement restricting the right of the member to transfer his interest in the cooperative was enforceable. The court determined that the member's sister-in-law was unlawfully residing in his apartment in violation of the occupancy agreement and concluded that the trial court had erred in not ruling in the cooperative's favor on its counterclaim seeking the sister-in-law's eviction. But the court did not discuss the *means* of eviction.

In a previous case, however, the Eighth Appellate District had allowed a cooperative member to be summarily evicted from his cooperative apartment because of arrearages in the monthly charges owed to the corporation. In *Central Park Place v. McDowell,*[27] the member was in arrears at the time the corporation filed a forcible-entry-and-detainer action under R.C. Chapter 1923. The occupancy agreement allowed for re-entry and repossession "through suitable action at law or in equity" upon nonpayment of carrying charges. The corporation sought only restitution of the property and did not request recovery of the delinquent carrying charges. The member argued, in part, that a subscription fee he had paid should have been applied to the arrearages. But the court concluded that "[a] forcible entry and detainer action affects only the question of the present right to possession * * * and possession [was] the sole ultimate issue in the case."[28] It did not otherwise address the issue of arrearages, because the corporation had not requested their recovery.

In *Murphy v. Brooklyn Acres Mut. Homes, Inc.,*[29] the Eighth Appellate District again had the opportunity to examine a forcible-entry-and-detainer action against a cooperative member. In that case, the member sought injunctive relief to prevent his removal from his home, further alleging breach of the covenant of quiet enjoyment and intentional infliction of emotional distress. Along with the injunction, he sought compensatory and punitive damages. Subsequently, the corporation filed its forcible-entry-and-detainer action. It also filed a motion to dismiss the member's complaint, arguing that he had an adequate remedy at law by asserting defenses in the eviction proceeding. The court agreed with the corporation. It explained that "[t]he sole issue in a forcible entry and detainer

---

26. *Id.*

27. *Central Park Place v. McDowell* (1974), 38 Ohio App.2d 29, 67 O.O.2d 186, 311 N.E.2d 533.

28. *Id.* at 31, 67 O.O.2d at 187, 311 N.E.2d at 535.

29. *Murphy v. Brooklyn Acres Mut. Homes, Inc.* (May 30, 1996), Cuyahoga App. No. 68593, unreported, 1996 WL 284856.

action is who is entitled to possession of the premises," and that such an action can include "claims for damages under the rental agreement."[30] It further stated that "if the additional claims for breach of the lease are incident to the possession action, these claims must be brought in the eviction action and cannot prevent an injunction action from being dismissed. * * * 'Incident to the possession action' means that when the tenant secures possession, the other relief will follow." [31] In determining that a forcible-entry-and-detainer action may include claims for damages under the rental agreement, the court relied on R.C.1923.081.

Thus, according to the Eighth Appellate District, a corporation may bring a forcible-entry-and-detainer action to evict a cooperative member from his or her dwelling unit.

## B. Other Jurisdictions

Not all states agree with the Eighth Appellate District. An Arizona appellate court determined that the Arizona Landlord and Tenant Act did not apply to cooperatives because proprietary leases of a cooperative were expressly excluded.[32] The cooperative had argued that it was entitled to bring summary eviction proceedings against a shareholder under Arizona's forcible-entry-and-detainer statute, which allowed proceedings for a "holdover by a person to whom lands, tenements, or real property were let." The court disagreed, concluding that the section applied only to landlord-tenant relationships. The court gave little weight to the fact that the parties had provided in the occupancy agreement for the landlord-tenant characterization, because, in its view, the parties could not confer subject-matter jurisdiction on a court where none otherwise existed by force of law. The court explained,

"The legislature recognized that although the cooperative is a hybrid property arrangement wherein the line between ownership and leasehold blurs, the cooperator has a real property ownership interest. The term "proprietary lease," used frequently to identify the relationship between the cooperator and the cooperative corporation, is oxymoronic. The cooperative corporation may indeed hold title to the real property, nevertheless, the cooperator also owns a real property interest. Precisely because the legislature recognized hybrid property arrangements carry with them ownership interests, section 33–1308(6) of ARLTA excludes from its reach not only cooperatives, but also condominiums."[33]

---

30. *Id.*

31. *Id.*

32. *Kadera v. Superior Court of Arizona* (App.1996), 187 Ariz. 557, 931 P.2d 1067.

33. *Id.* at 563, 931 P.2d at 1073.

The court found summary proceedings inapplicable to residential housing cooperatives because the cooperative member's total investment in his property was more than that of an ordinary tenant. The court concluded that, except for the transfer of title, the documents entered into by the parties, the agreements they made, and the responsibilities they assumed were all indications of a residential real estate transaction. It compared the relationship to that found in a deed-of-trust arrangement. Consequently, the court concluded that the corporation was barred from initiating any summary proceedings. It explained that because the cooperator's interest was in the nature of real property, Arizona real estate law superceded any conflicting provisions in the occupancy agreement and that the corporation had all applicable statutory remedies relating to real property. "By deciding that residential housing cooperatives are governed by Arizona real estate law, we define and protect both the rights of cooperators and cooperative corporations. Any resultant civil litigation will ensure that a body of law relating to residential cooperatives can be developed to further this goal."[34]

Other courts have seen no reason to treat a proprietary lease any differently from any other lease under forcible-entry-and-detainer statutes. An Illinois appellate court recognized both the hybrid nature of a cooperative and the ownership interests held by its constituent members.[35] It concluded, however, that, as to a given unit, a member had only a leasehold interest. It refused, therefore, to exclude a proprietary lease from the operation of the Illinois forcible-entry-and-detainer statute merely because the leasehold interest had been paired with an ownership interest in the corporation that held title to the real estate.[36] The court explained, "We are not persuaded * * * that the member's proprietary rights are necessarily paramount to the cooperative's interest in maintaining its viability. The cooperative is dependent for its existence on the 'rent' received from its members pursuant to the proprietary lease. Thus, it makes sense that the cooperative should have access to the familiar and effective remedies available to a landlord against a delinquent tenant."[37]

An Indiana appellate court decided that because the relationship between a cooperative member and a corporation in a cooperative housing plan was a legal hybrid, the remedy to dispossess the cooperator should also be of a hybrid

---

34. *Id.* at 566–567, 931 P.2d at 1076–1077.

35. *Quality Mgt. Serv., Inc. v. Banker* (1997), 291 Ill.App.3d 942, 226 Ill.Dec. 264, 685 N.E.2d 367.

36. *Id.* at 946, 226 Ill.Dec. at 267, 685 N.E.2d at 370.

37. *Id.* at 947, 226 Ill.Dec. at 267, 685 N.E.2d at 370.

nature.[38] The court characterized the member as an owner of personal property, the stock in the cooperative, which the member had purchased solely for the purpose of occupying a particular unit. Thus, the cooperative member had a vested interest that she could not be forced to forfeit merely on the basis of a finding that she had breached her occupancy agreement. The court also concluded that it would be too burdensome to require the cooperative to foreclose statutorily on the member's interest. The court held that ejectment was the proper remedy, with the trial court directing the proceedings for the sale of the member's interest in the unit.

A New Jersey court concluded that the relationship between a cooperative apartment association and a member created a unique form of property ownership that failed to fit into common-law classifications.[39] Because the relationship did not constitute a landlord-tenant relationship, the court determined that it had no jurisdiction to hear the corporation's summary-dispossession action.

A Georgia court recognized the various ways other jurisdictions had considered dispossession proceedings, including views expressed in *Kohler v. Snow Village*, and concluded that its determination would be based on the express terms of the occupancy agreement.[40] The court noted that a cooperative needed the cooperative fees and other assessments levied against its members and that the failure of one member to pay affected all the other members. Thus, the court determined that it made practical sense to allow summary proceedings so as to protect the interests of all the members.

## X. The Applicability of Forcible Entry and Detainer

"An action of forcible entry and detainer is an action at law based upon contract. It is an action to obtain possession or repossession of real property which had been transferred from one to another pursuant to contract. * * * Such a proceeding is not an action to determine ownership of the title to the property."[41] Further, under Ohio law, the action is "a remedy which is purely statutory and which is unknown at common law, and it may be defined as a summary civil proceeding provided by statute in certain enumerated cases, intended to affect only the question of possession of real property. * * * The purpose of the forcible entry and detainer statutes is to provide a summary,

---

38. *Cunningham v. Georgetown Homes, Inc.* (Ind.App.1999), 708 N.E.2d 623.

39. *Plaza Road Coop. v. Finn* (1985), 201 N.J.Super. 174, 492 A.2d 1072.

40. *Jordan v. Placer Holding Co.* (1994), 213 Ga.App. 218, 444 S.E.2d 112.

41. *Behrle v. Beam* (1983), 6 Ohio St.3d 41, 44, 6 OBR 61, 64, 451 N.E.2d 237, 239–240.

extraordinary, and speedy method for the recovery of the possession of real estate in the cases especially enumerated by statute."[42]

R.C. 1923.02(A)(6) provides that forcible entry and detainer can be had "[i]n any other case of the unlawful and forcible detention of lands or tenements." The leases here clearly provide that, upon certain enumerated defaults, Woodford has the right to invoke summary proceedings to re-enter and repossess a unit. Gvozdanovic thus agreed to allow Woodford possession in the case of a default, but he failed to honor that agreement. Because the right of possession depended entirely upon the terms of their agreement, we believe that the broad language contained in R.C. 1932.02(A)(6) made forcible entry and detainer an appropriate remedy for Gvozdanovic's unlawful detention of his cooperative unit under the facts of this case.

While we recognize that the cooperative member may have more at stake than a mere tenant, we believe this fact alone is insufficient to preclude the application of forcible entry and detainer to cooperative leases. For example, a vendee under a land contract can be summarily dispossessed of property he unlawfully detains.[43] A vendee in that situation is analogous to a cooperative member in that a vendee usually has "made a substantial down payment or * * * substantial payments on the contract or on repairs during the period of his occupancy. As a result, the vendee may have acquired a substantial equity in and to the premises at the time judgment for possession is rendered against him."[44] (The legislature, however, has provided a vendee protection from a forcible-entry-and-detainer action, if the vendee has paid in accordance with his contract for five or more years.[45] At that time, possession may only be recovered by foreclosure and judicial sale.) Thus, we conclude that an action under Ohio's forcible-entry-and-detainer statute would have been appropriate in this case.

## XI. Notice to Vacate

Woodford characterizes its counterclaim as one for forcible entry and detainer. The counterclaim identified the property at issue, stated that Gvozdanovic was a member of the cooperative, alleged that he had breached the terms of the leases, the regulations, and the rules, and further stated that it had notified

---

42. *Fodor v. First Natl. Supermarkets, Inc.* (1992), 63 Ohio St.3d 489, 494, 589 N.E.2d 17, 21, quoting 37 Ohio Jurisprudence 3d (1982) 78–80, Ejectment, Section 67.

43. See R.C. 1923.02(A)(7).

44. *Kuhn v. Griffin* (1964), 3 Ohio App.2d 195, 203–204, 32 O.O.2d 278, 283–284, 209 N.E.2d 824, 829.

45. R.C. 5313.07.

him of his default and warned him that his leases would be terminated unless he cured his breach.

Gvozdanovic argues in his first assignment that the court erred by granting Woodford the right to re-enter because Woodford had failed to comply with the three-day notice to vacate required under the forcible-entry-and-detainer statute. If it is assumed that forcible entry and detainer can be brought as a counterclaim,[46] R.C. 1923.04(A) provides, in pertinent part, that "a party desiring to commence an action under this chapter shall notify the adverse party to leave the premises, for the possession of which the action is about to be brought, three or more days before beginning the action." If a landlord is seeking to recover residential premises, the notice the landlord provides must contain the following language in a conspicuous manner: "You are being asked to leave the premises. If you do not leave, an eviction action may be initiated against you. If you are in doubt regarding your legal rights and obligations as a tenant, it is recommended that you seek legal assistance."[47] The notice to Gvozdanovic did not contain this language. R.C. 1923.05 also requires that the "complaint shall particularly describe the premises so entered upon and detained, and set forth either an unlawful and forcible entry and detention, or an unlawful and forcible detention after a peaceable or lawful entry of the described premises." (Of course, the archaic, legalistic language brings to mind men-at-arms forcibly taking possession of the baron's land and refusing to move. Someday, perhaps, the legislature will draft an eviction chapter in plain language.)

■ The three-day notice to vacate under the statute "is a statutory prerequisite to filing an action in forcible entry and detainer."[48] As this court has explained, "in order to effectuate such an eviction, the plaintiff must notify the adverse party to leave the premises three or more days prior to initiating the action* * *."[49] Thus, service of the three-day notice is mandatory.[50]

---

46. Accord *Wengerd v. Martin* (Apr. 5, 2000), Wayne App. No. 99CA0004, unreported, 2000 WL 354148, and *Four Star Serv., Inc. v. Akron* (Oct. 27, 1999), Summit App. No. 19124, unreported, 1999 WL 980558.

47. R.C. 1923.04(A).

48. *Voyager Village Ltd. v. Williams* (1982), 3 Ohio App.3d 288, 290, 3 OBR 333, 336, 444 N.E.2d 1337, 1341.

49. *Sanders v. Favors* (Dec. 29, 1995), Hamilton App. No. C–950304, unreported, 1995 WL 763681.

50. *Voyager Village Ltd. v. Williams*, 3 Ohio App.3d at 292, 3 OBR at 337–338, 444 N.E.2d at 1342.

Woodford argues that it met its obligation under the statute by fulfilling its obligation under the leases to give a thirty-day notice that the agreement would expire unless the defaults were cured. The contractual notice also informed Gvzodanovic that failure to correct the defaults would result in the termination "of his tenancy rights" and "termination of his Membership rights," and that the notice was to provide him "with all required advance notices before legal action is taken."

█ But we have said that "[t]ermination and eviction are not always synonymous."[51] Thus, the "three-day notice of removal to tenant is in addition to and not in substitution of whatever notice is substantially necessary to effect a termination of the lease by the private lease agreement of the parties."[52] The parties in this case were contractually bound by the thirty-day notice of a lease expiration upon failure to cure defaults. This, however, did not substitute for the statutorily required three-day notice to vacate. This notice, which is called a "three-day notice" though it can be given more than three days in advance, must contain the required language. Woodford's failure to provide the statutory three-day notice was fatal to a forcible-entry-and-detainer claim.

## XII. Ejectment

█ While the counterclaim failed under the standards of the forcible-entry-and-detainer statute, it did state a claim for relief in ejectment. Woodford sought an "eviction" in the counterclaim. The trial court, in establishing a scheduling order calling for a trial fifteen months after Woodford's counterclaim was filed, clearly demonstrated that it did not perceive or treat the counterclaim as a "summary, extraordinary, and speedy" method for the recovery of possession.

█ "Any proceeding by a landowner to remove another person from actual possession of land owned by the landowner is generally referred to as an 'eviction.' In Ohio, an eviction can be sought by the summary forcible entry and detainer action * * * or by an ejectment action. * * * [A]n ejectment proceeding is an action to recover possession of land, subject to all the regular rules of civil procedure."[53] R.C. 5303.03 sets forth the requirements for such a claim. The plaintiff only needs to provide a sufficient description of the legal estate, to

---

**51.** *Cincinnati Metro. Hous. Auth. v. McCollum* (1975), 45 Ohio App.2d 197, 199, 74 O.O.2d 273, 274, 341 N.E.2d 857, 859.

**52.** *Id.* at 200, 74 O.O.2d at 275, 341 N.E.2d at 860, quoting *Hous. Auth. of Bayonne v. Isler* (1974), 127 N.J.Super. 568, 318 A.2d 432.

**53.** O'Leary, The Inadvisability of Applying Preclusive Doctrines to Summary Evictions (1998), 30 U.Tol.L.Rev. 49, 96, fn. 3.

allege that he has a legal estate in the property, and to claim that he is entitled to possession of the property but is unlawfully kept out of possession by the defendant. "An ejectment action is a possessory action at law" and "[h]istorically, the sole form of relief available to a plaintiff * * * was possession of his or her land and damages (reasonable rental value of the withheld land)."[54] But, "[i]n recent years, courts, in dealing with an action in ejectment, tend to eliminate the technicalities of pleading and procedure in order to afford substantial justice to the litigants by the most simple and direct means." [55] "To recover the possession of real property in an ejectment action, the plaintiff must have title to the property and a present right of possession * * *." [56]

 We believe ejectment is particularly suited to a cooperative situation because the one court can deal with all the issues. Thus, we also review the trial court's judgment in this case under the standards governing a claim for ejectment. (We note that in ejectment, an occupying claimant is entitled to certain statutory rights.[57] These rights are not applicable to this case because Gvozdanovic never had title to Building G,[58] and he knew that his interest could terminate if he breached his leases.[59])

## XIII. Summary–Judgment Standard

There is no dispute that Woodford is the titleholder of the property. What is disputed is its right to possession. The trial court granted summary judgment to Woodford, concluding that the evidence demonstrated as a matter of law that Woodford was entitled to possession of Building G.

Summary judgment is only to be granted "when no genuine issue of material fact remains to be litigated, the moving party is entitled to judgment as a matter of law, and it appears from the evidence that reasonable minds can come to but one conclusion, and, with the evidence construed most strongly in favor of the nonmoving party, that conclusion is adverse to that party." [60] The moving party

---

54. *McGuire v. Kashen* (Sept. 15, 1995), Lucas App. No. L–94–294, unreported, 1995 WL 547781.

55. ·*Id.*

56. 25 American Jurisprudence 2d (1996), Ejectment, Section 6.

57. R.C. 5303.07 through 5303.17.

58. See R.C. 5303.08.

59. See *Quill v. R.A. Investment Corp.* (1997), 124 Ohio App.3d 653, 707 N.E.2d 35.

60. *Risch v. Friendly's Ice Cream Corp.* (1999), 15 IER Cases (BNA) 1032, 136 Ohio App.3d 109, 736 N.E.2d 30, citing *State ex rel. Howard v. Ferreri* (1994), 70 Ohio St.3d 587, 589, 639 N.E.2d 1189, 1192.

"bears the initial burden of identifying parts of the record that demonstrate the absence of a genuine issue of material fact. When the moving party meets that burden, the nonmoving party must produce evidence on the issues for which it will bear the burden of production at trial." [61] It is only disputes over "facts that might affect the outcome of the suit under the governing law [that] will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." [62] We review the trial court's decision *de novo.* [63]

## XIV. Notice and Waiver

As to Gvozdanovoc's first assignment, because we characterize the counterclaim as one for ejectment, and not for forcible entry and detainer, Woodford was under no statutory mandate to provide a three-day notice to vacate. Because ejectment is not a summary proceeding, there is no necessity for the statutory three-day notice, which is only mandatory in forcible entry and detainer cases. Under its agreement with Gvozdanovic, Woodford was required to provide Gvozdanovic with a warning that his leases would expire in thirty days if he failed to cure the defaults. Woodford gave the appropriate notice.

Gvozdanovic also argues that Woodford's acceptance of monthly payments waived its right to re-enter and repossess Building G. While acceptance of *future* rent payments following a three-day notice to vacate under R.C. Chapter 1923 may constitute a waiver of the right to act on the notice, [64] that notice is not at issue in an ejectment action. Furthermore, we doubt that waiver is consistent with the purposes of a cooperative housing arrangement. As explained by one commentator,

"Preventing the cooperative from removing a tenant who is not paying maintenance can severely harm the other tenant-stockholders who may never recover any extra maintenance they will be forced to pay in order to make up the difference. In fact, non-paying by tenant-stockholders can begin a 'domino' effect where frequent maintenance increases by defaulting stockholders forces other stockholders to default in paying the higher amount, which in turn forces further

61. *Id.,* citing *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 274.

62. *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211.

63. *Smiddy v. The Wedding Party, Inc.* (1987), 30 Ohio St.3d 35, 30 OBR 78, 506 N.E.2d 212.

64. See *Associated Estates Corp. v. Bartell* (1985), 24 Ohio App.3d 6, 24 OBR 28, 492 N.E.2d 841.

maintenance increases. This cycle can continue indefinitely until the entire cooperative is endangered."[65]

For the same reason, we conclude that it would be unfair to the innocent cooperative members to force the corporation to make a Hobson's choice between not waiving its right to oust a noncomplying member by refusing to accept payments or protecting the other members' financial interests by foregoing the ouster of a defaulting member by accepting the defaulter's payment for his or her portion of the cooperative's mortgage. We overrule Gvozdanovic's first assignment.

## XV. Right to Repurchase

Gvozdanovic argues in his second assignment that the trial court erred by granting Woodford the right to repurchase his equitable interest for less than the fair market value. He argues that because there was no evidence that he acted willfully, he should not have been made to forfeit his equitable interest in Building G. The trial court stated in its memorandum decision that the agreement between Woodford and Gvozdanovic allowed Woodford to repurchase the apartment at book value or to proceed with a sale using reasonable diligence. This statement was merely a recitation of the terms the parties had agreed to and was not an order by the court. Gvozdanovic now argues that the terms he agreed to constituted a forfeiture. Even if the agreement gave rise to a forfeiture, the Ohio Supreme Court has explained,

"Where the parties, in their contract, have agreed upon a stipulation and definite remedy to be employed by the grantor, in case of breach of a subsequent covenant by the grantee, the grantor ordinarily will be relegated to the relief thus stipulated in his contract. This is the rule applied by the courts generally; and it is applied to cases in ejectment, in the cancellation of leases between landlord and tenant, and in cases for forfeiture or re-entry under a statute or at common law."[66]

Thus, if the parties agree to a forfeiture, courts will generally uphold the parties' agreement.[67]

Gvozdanovic relies on cases involving the run-of-the-mill lease agreements and insurance policies to support his contention that equity abhors a forfeiture and that forfeiture of a lease for nonpayment of rent is available only if the lessee acts willfully or maliciously. But we hold that even if the agreed-to

---

65. Heller, Apartment Cooperation Remedies (June 17, 1992), 383 PLI/Real Estate Law 41.

66. *New York Cent. RR. Co. v. Bucyrus* (1933), 126 Ohio St. 558, 569, 186 N.E. 450, 454.

67. *Id.*

right of Woodford either to purchase Gvozdanovic's shares at book value or to sell them on his behalf is considered a forfeiture, willfulness or maliciousness is not a prerequisite under a cooperative housing arrangement. It is enough that a member breached his agreement. This is because, unlike the normal landlord-tenant relationship, innocent cooperative members suffer when a member breaches obligations to the cooperative. As explained by one commentator,

"The economic and social interdependence of the tenant-owners demands cooperation on all levels of cooperative life if a tolerable living situation is to be maintained. Each tenant-owner is required to give up some of the freedoms he would otherwise enjoy if he were living in a private dwelling and likewise is privileged to demand the same sacrifices as his cotenant-owners with respect to his rights."[68]

Gvozdanovic agreed that if his rights under the leases were terminated, Woodford had the option either to repurchase his unit at book value or to proceed with reasonable diligence to sell his rights to the unit. We see no reason to reform the contract terms he agreed to when he became a member of the cooperative.

## XVI. Motion to Amend

 Gvozdanovic argues in his third assignment that the trial court abused its discretion in not granting his motion for leave to amend his complaint. The trial court determined that the motion was untimely and would cause undue delay to the prejudice of Woodford. The litigation had been ongoing for three years, and Gvozdanovic's motion for leave to amend was filed on the last day scheduled for summary-judgment motions. Granting the motion to amend would have forced the parties to return to the beginning stages of litigation. Whether to allow a plaintiff to amend a complaint rests in the trial court's discretion.[69] Thus, a denial of a motion for leave to amend a complaint will be reversed only where the denial "implies that the court's attitude is unreasonable, arbitrary or unconscionable."[70] Generally, a motion for leave to amend "should be granted absent a finding of bad faith, undue delay or undue prejudice to the opposing party."[71] In this case, the trial court found that the motion for leave to amend

---

68. Wallace, 13 Hastings L.J. at 363.

69. See *Wille v. Hunkar Lab., Inc.* (1998), 132 Ohio App.3d 92, 109, 724 N.E.2d 492, 504.

70. *Id.*, quoting *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142.

71. See *Hoover v. Sumlin* (1984), 12 Ohio St.3d 1, 12 OBR 1, 465 N.E.2d 377, modified on other grounds by *Jim's Steak House, Inc. v. Cleveland* (1998), 81 Ohio St.3d 18, 688 N.E.2d 506.

was untimely filed and prejudicial. We conclude that the denial of Gvozdanovic's motion was not an abuse of discretion.

## XVII. Woodford's Cross–Appeal

### A. Right to Repossess

■ In its first assignment, Woodford argues that the trial court erred by refusing to grant a writ of restitution. Woodford and Gvozdanovic executed a lease for each of the two units comprising Building G. Article XIII of the leases provided that if any of the occurrences in the Article happened, Woodford would supply Gvozdanovic thirty days' notice that the leases would expire unless the default was deemed cured in a manner satisfactory to Woodford. The leases further stated that "it shall thereupon be lawful for [Woodford] to re-enter the dwelling unit and to remove all persons and personal property therefrom, either by summary dispossess proceedings or by suitable action or proceeding at law or in equity or by force or otherwise, and to repossess the dwelling unit in its former state as if this Agreement had not been made." Included in the list of occurrences that could result in repossession were the failure of Gvozdanovic to effect or pay for repairs and maintenance, the failure to pay monthly carrying charges, the failure to obey house rules, and any default in the obligations under the leases.

Woodford presented evidence that Gvozdanovic (1) did not timely pay carrying charges; (2) had prospective buyers come to Building G to view vehicles he had for sale on the property; (3) had dogs on the property in violation of Woodford's House, Ground, and Pool Rules; and (4) allowed other than immediate family members to occupy the unit. Any one of these breaches allowed Woodford to re-enter and repossess Building G. Gvozdanovic failed to present evidence of the existence of a genuine issue of material fact on the issue of Woodford's entitlement to repossess Building G. In fact, Gvozdanovic even voted himself in default.

■ The trial court correctly determined that Woodford was entitled to repossess Building G. It failed, however, to provide the means by which to peacefully do so. The trial court did not err by refusing to grant a writ of restitution as specifically provided for under R.C.1923.13 because the counterclaim failed to make out a claim for forcible entry and detainer. The court did err, however, by not issuing a writ of possession, thus restoring the possession of Building G to Woodford.[72] A writ of possession, formally known as *habere facias possessionem*, historically has been the writ that gives "a successful ejectment-

---

72. Accord *Kuebler Brewing and Malting Co. v. McGuire* (C.P.1901), 8 Ohio N.P. 300, 1901 WL 827; R.C. 2327.02.

action plaintiff the possession of the recovered land." [73] Under the writ, the sheriff is ordered to remove the defendant and his personal property from the property recovered in ejectment. We sustain Woodford's first assignment.

## B. Disposition of Shares of Stock

■ Woodford claims in its second assignment that the trial court erred by not terminating Gvozdanovic's membership in the corporation, and by not granting it costs and attorney fees.

The trial court apparently believed that it was limited in the context of the claim brought by Woodford to the issue of restitution of the property. While historically an ejectment action was for possession of real estate and the reasonable rental value of the property,[74] even in 1883 a plaintiff could join claims for damages for the property's detention, lost rents and profits, and "[c]auses of action arising out of the same transaction, or transactions connected with the subject of the action." [75] Today, it is clear under Civ.R. 18(A) that a party is allowed to join as independent or alternate claims any legal or equitable claims.

In the context of a cooperative arrangement, the repossession of the living unit without the corresponding shares of stock has little value to the corporation (and, hence, the other members). This is because the "cooperative interest" of the cooperative member consists not only of the real estate, but the shares of stock and the agreements between the shareholder-cooperator and the corporation, all of which are personal property.[76] Because "the cooperative ownership plan is a unique form of property ownership, one whose hybrid qualities should be recognized by a policy oriented approach, rather than a rigid attempt to fit into existing legal pigeonholes," [77] we believe that the trial court had authority, in considering Woodford's ejectment claim, to determine the disposition of Gvozdanovic's shares of corporate stock. This was especially true where Woodford sought termination of his membership and where, "[i]n recent years, courts, in dealing with an action in ejectment, tend to eliminate the technicalities of pleading and procedure in order to afford substantial justice to the litigants by the most simple and direct means." [78]

---

73. Black's Law Dictionary (7 Ed.1999) 716.

74. See *McGuire v. Kashen, supra.*

75. See *Countee v. Armstrong* (1883), 9 Ohio Dec.Rep. 62, 1883 WL 5050.

76. See *Earl W. Jimerson Housing Co., Inc. v. Butler* (1978), 97 Misc.2d 563, 412 N.Y.S.2d 560.

77. *Id.* at 566, 412 N.Y.S.2d at 563, 97 Misc.2d 816, 412 N.Y.S.2d 563.

78. *McGuire v. Kashen, supra.*

It strikes us as particularly wasteful of judicial resources (and the parties' also) to suggest, as the trial court did, that an entirely separate lawsuit be commenced on that issue. We hold that the issue of share ownership should be determined in the same action as the right of possession. For the same reason, we conclude that the issue of attorney fees should also have been considered by the trial court. Woodford's second assignment is sustained.

## XVIII. Disposition

We affirm the trial court's entry of summary judgment in favor of Woodford on (1) Gvozdanovic's claims and (2) Woodford's right to re-enter and repossess Building G; but we reverse that part of the trial court's judgment that failed (1) to grant a writ of possession and (2) to determine the disposition of Gvozdanovic's shares in the cooperative and whether Woodford was entitled to damages and attorney fees.

We remand this case and order the trial court to issue a writ of possession in favor of Woodford, to terminate Gvozdanovic's membership in the cooperative, and to order that Gvozdanovic return his shares to Woodford for disposition at its option pursuant to the cooperative's Amended Code of Regulations. We also order the trial court to determine whether Woodford is entitled to damages and attorney fees and, if so, to what extent.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

HILDEBRANDT, P.J., and DOAN, J., concur.